HINCHMAN et al. v. RIPINSKY.

(First Division. Juneau. July 10, 1908.)

No. 547A.

1. PUBLIC LANDS (§ 35*)—HOMESTEAD—POSSESSORY RIGHTS.

A possessory right to enable the settler to segregate and hold a portion of the public land can only be acquired by actual, as distinguished from constructive, possession, by which is meant a subjection of the land to the will and dominion of the claimant; and this is usually evidenced by a substantial inclosure, by cultivation, occupation, or some other proper and appropriate use, according to the locality of the property.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 72–77; Dec. Dig. § 35.*]

2. PUBLIC LANDS (§ 35*)—HOMESTEAD—TOWNSITE—HAINES MISSION.

The defendant claimed title to an unmarked tract of 40 acres on the public domain as a possessory right under the homestead law. Its boundaries were not marked. He neither cultivated nor occupied the tract, but claimed by purchase from alleged prior claimants, who had lived only on a garden spot along the beach. Plaintiffs and others located lots, erected buildings, and built a town on the tract. Held, that defendant had no title, that the land was a part of the public domain and the townsite locators had the better right to the lots.

[Ed. Note.—For other cases, see Public Lands, Dec. Dig. § 35.*]

*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

3. QUIETING TITLE (§ 30*)—PARTIES—JOINDER AS PLAINTIFFS.

   Several claimants of town lots, under different locations, may join in one complaint to remove a cloud from their titles, where the defendant claims one title to a large tract of land embracing all the lots, and his claim is antagonistic in the same degree to all, and is neither good nor bad as against all the plaintiffs.

   [Ed. Note.—For other cases, see Quieting Title, Dec. Dig. § 30.*]

Plaintiffs bring this suit to quiet their respective titles to certain lots or parcels of land situated in the settlement or town known as Haines Mission, lying on the westward shore of Lynn Canal, at what is known as Portage Cove. The land in controversy is all embraced in United States survey No. 573. The particular description of this survey by metes and bounds is set forth in the complaint, and plaintiffs allege that these lands, which embrace the principal business section of Haines Mission, or Haines, are now, and since 1897 have been, in the actual possession and occupation of the plaintiffs. Their respective claims to the various lots are specifically enumerated in the complaint, and it is there asserted by them that they have in good faith occupied the various parcels during the said time, and have constructed thereon buildings, such as stores, hotels, residences, etc., the value of which exceeds the sum of $50,000. They also assert a common interest and claim in and to certain streets, avenues, and alleys as public rights of way or highways, which they allege are used in common by all the residents of the town and by the public generally. They also allege that the defendant, Solomon Ripinsky, claims in and to the entire tract described in the complaint an interest or estate adverse to the plaintiffs, but that, with the exception of two small parcels, one 25 by 50 feet, which defendant purchased from one H. Fay, and the second 100 by 150 feet, occupied by him for residential purposes, the defendant has never occupied any of the land to which the plaintiffs seek to quiet

---

*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

their title, and that he has no title or interest in or to the said land.

To the allegations of the plaintiffs the defendant interposes a general denial, and sets up an affirmative defense, in which he alleges that for a long time prior to August 1, 1897, his grantors were the owners and in possession of all the lands described, and that by virtue of the prior occupancy and improvement of said land by his grantors they were entitled to the possession thereof, and that prior to August 1, 1897, the grantors had conveyed to the defendant all their rights, title, and interest therein; that under said conveyance defendant had gone into and remained in the actual, open, notorious, and exclusive possession and occupancy of said land as a home, by reason of which acts he was the owner thereof against all persons except the United States, and was entitled thereto, and to enter the same as a homestead under the act of Congress extending the homestead laws of the United States to Alaska. He also alleges that on the date above mentioned, and while he was such owner so in possession and occupancy, the plaintiffs and their grantors unlawfully and with force and violence, and against his will and in disregard of his rights, entered upon said lands and ousted him therefrom.

The allegations of the affirmative defense are put in issue by the reply. On stipulation of counsel, the testimony in the case was taken before a referee. At the hearing before the referee, and before any evidence was taken, the defendant objected to the taking of any testimony on behalf of the plaintiffs, on the ground that the complaint does not state facts sufficient to constitute a cause of action, or to entitle the plaintiffs to the relief sought, or to any relief. The question of the sufficiency of the complaint and of the amended complaint was raised by timely demurrer. The court, after hearing the demurrer to the original complaint, ordered the plaintiffs to specify the particular holdings, and, on this being done, defendant de-

murred to the amended complaint. This demurrer was over-
ruled. The question as to the sufficiency of the complaint,
therefore, was settled for the purposes of this trial. In order
to determine the other questions raised by counsel for the de-
fendant in his brief, it will be necessary to first examine the
evidence.

Shackleford & Lyons, for plaintiffs.

R. W. Jennings and Malony & Cobb, for defendants.

GUNNISON, District Judge. The facts, as disclosed by
the evidence, are substantially as follows: The land in con-
troversy consists of some 15 acres lying north of and adjoin-
ing the tract located for and occupied by the Presbyterian
Mission at Haines. Within the bounds of this tract are situ-
ated the principal business, and a large part of the residential,
portions of the settlement or town of Haines. The town has
been platted, and streets and alleys laid out and used by the
people of Haines, for several years. The land has been cleared
by the plaintiffs and their predecessors, streets and alleys
graded, and store buildings, hotels, and houses used as resi-
dences, barns, and warehouses, and structures of like charac-
ter, have been erected upon the ground. The estimates of the
amounts expended in this work range from $50,000 to $100,-
000. The first of the settlers at Haines made their locations
and commenced their occupancy on the 14th of December,
1897, and while it is a well-known rule of law that the plaintiffs
must recover upon the strength of their title, and not upon the
weakness of the defendant, the principal question in the case
becomes one as to whether or not the tract upon which the lo-
cations by the settlers were made was public domain at the
time. The defendant, Col. Sol. Ripinsky, deraigns his posses-
sory title to this tract under a quitclaim deed from Mrs. Sarah
Dickenson, by whom, he asserts, this tract in controversy was

possessed and occupied for many years prior to the time when plaintiffs went upon the ground.

In order to understand the situation, it is necessary to go back to the year 1878, when George Dickenson, the husband of Mrs. Sarah Dickenson, first went upon the ground. Dickenson was accompanied by his Indian wife and their children. At that time, acting as the representative of the Northwest Trading Company, he established a trading post near the beach at Portage Cove, in the buildings now occupied by the defendant, and located for the trading company a tract, which his son William Dickenson testified was 40 acres in extent. At the beach he erected three structures: A frame house, which was used as a store and dwelling; and two log houses, one a warehouse, and the other for the use of the natives who came to trade. At the same time he located a tract of 160 acres for the mission, south of and adjoining the land taken up for the trading company. A dense forest of heavy timber and thick undergrowth covered all the land in question. Through this forest, a narrow foot trail extended from the beach, near where he constructed his buildings, to the Chilcat river, some distance to the westward. At Dickenson's request, an officer from the United States steamship Jamestown ran the lines of these tracts, and Dickenson set the corner posts. William Dickenson, the son, testifies that around this 40-acre tract his father ran a fence, consisting partly of brush and rails on the south line, and the balance of a single galvanized wire, and that he also blazed the line. Around the cabins which he had constructed Dickenson cleared a small piece of ground, which he used as a garden. The evidence fails to disclose that the tract of land, other than the small portion cleared for the purposes of the garden, was ever put to any use by Dickenson as the representative of the trading company, or that he did anything in the way of maintaining the fence or further improving the land. William Dickenson testified that in 1880 his father

bought out the interest of the Northwest Trading Company at that point. This is the only evidence upon the subject. No deed or other documentary evidence of the transaction was offered, and, indeed, it is doubtful if any was executed. From 1880 George Dickenson continued to occupy the buildings and garden and carry on the trading business with the natives at that place until 1888, when he died.

. I am unable to find anything in the evidence which indicates that Dickenson, after the time at which he took over the interest of the trading company, repaired the fences, maintained his corner posts, or made any improvements whatsoever upon the tract, or put the tract to any beneficial use whatsoever, aside from the small piece of ground lying immediately about the house and containing not to exceed a couple of acres of ground. This small tract, about which he built a brush fence, he cultivated as a garden. Shortly after taking over the business, he permitted one Blind Isaac, an Indian, to build a cabin just north of his dwelling, and within the bounds of the tract originally located for the trading company. A post was set to show the new line between his premises and those of the native. William Dickenson testifies that his father, during his occupancy, cleared the land back from the beach to a point about at the eastern line of block No. 2, as it appears on the map (Plaintiff's Exhibit No. 1); but this testimony is uncorroborated, and is contradicted by several witnesses. As some 20 years or more have elapsed between the time of which he was testifying, and the appearance of the country has changed so completely from what it was at that time, it is probable that the witness was mistaken as to the distance. It is also claimed by William Dickenson that the tract located and claimed by his father was 40 acres in extent, that he never claimed any less, and that he never disposed of any of the land save the small piece upon which he allowed the Indian, Blind Isaac, to build. After the death of the senior Dickenson, the family, consisting

of his wife, Sarah Dickenson, defendant's grantor, his son, the witness William Dickenson, who at that time was a young man of 21, and a daughter, continued to reside at the trading post and carry on the business for some time. Mrs. Dickenson cultivated a portion, but not all, of the garden for a few seasons; but during this period between the death of George Dickenson and the execution of the deed to Col. Ripinsky the Dickensons, so far as the evidence shows, did not maintain the original fence or lines, nor did they exercise a single act of ownership or dominion over any portion of the tract outside of the garden plot.

In 1895 Mrs. Dickenson quitclaimed to Mrs. John Dalton an acre of ground lying between the buildings of the trading post and the property of the mission to the south. This was a portion of the tract which had been cleared for a garden by her husband.

Now, let us examine the acts of the defendant, as throwing light upon his knowledge of conditions as they existed and the ownership of the tract of land in question. In 1886 the defendant, Col. Ripinsky, as the agent of the United States Bureau of Education, came to Portage Cove to establish at that point a government school. George Dickenson and his family were at that time living at the trading post, and Dickenson and Ripinsky became well acquainted. From 1886 until the present time Col. Ripinsky has lived in that vicinity, and has been engaged in various business enterprises and occupations. A portion of the time he lived on the Chilcat side of the peninsula. In 1897 he was engaged in the trading business at Chilcat. Late in November or early in December of that year an outfit known as the "Perry Humbert Expedition" landed at Portage Cove with the avowed intention of projecting a railroad to the interior. His long residence in the country had made him familiar with the business advantages of the various localities, and this, taken with the proposed railroad starting from Port-

age Cove, made it apparent that that was to be the best site for a business in that vicinity. He immediately set about acquiring the rights of Mrs. Dickenson, and through the offices of Rev. Franklin A. Rogers, who was stationed at Haines as a missionary, he negotiated for and finally obtained from Mrs. Dickenson a quitclaim deed (Defendant's Exhibit No. 7), which is as follows:

"Chilcat, Alaska, December 2, 1897.

"Know all men by these presents, that I, Sarah Dickenson, of Chilcat, Alaska, in consideration of ($200.00) two hundred dollars to me in hand paid by Sol. Ripinsky, of Chilcat, Alaska, the receipt whereof is hereby acknowledged, do hereby bargain, sell, and transfer unto the said Sol. Ripinsky both buildings and all the land adjoining the Presbyterian mission ground, adjoining the mission ground on the south to the Indian village on the north, situate at Haines Mission, Alaska, except one acre of land claimed by Mrs. J. Dalton. All the above property was left to me by my deceased husband, George Dickenson, was known as the Dickenson property, which I will defend against all claims.                    [Signed]   S. Dickenson.

"In the presence of
        "F. A. Rogers.
        "G. A. Baldwin."

"Be it known that on the 2d day of December, one thousand eight hundred and ninety-seven, Mrs. Sarah Dickenson, of Chilcat, Alaska, personally appeared and makes oath that the following statement by her subscribed is true.                    [Signed]   S. Dickenson.

"In the presence of
        "F. A. Rogers,
        "G. A. Baldwin,
    "Before me,                              Sol. Ripinsky,
    "[Seal.]                      Notary Public, District of Alaska."

Col. Ripinsky himself drew the instrument and took the acknowledgment of it as a notary. His explanation as to why he, who was the grantee in the deed, took the notarial acknowledgment of it, is that he was the first, and in fact the only, notary public in Alaska at that time. Besides the acknowledgment before him as a notary, the signature of Mrs. Dickinson

was witnessed by Rogers, who carried on the negotiations for the purchase, and Grant A. Baldwin, the person who was then in charge of the Koebler & James store at Chilcat. The deed bears date the 2d day of December, 1897. It is contended by plaintiffs that the deed was not executed until later in the month, and Harry Fay, a plaintiff and a witness, testified that Baldwin was not called upon to witness the signature of the deed until some time after he (Fay) had made his location of a lot at Haines. The instrument itself negatives that assertion, since it appears from the file mark upon it that it was filed for record with the United States commissioner at Dyea on December 15, 1897, at 10 p. m. It is, of course, possible that the instrument might have been executed on the 15th of December, and yet filed on that day; but the preponderance of the evidence is against that conclusion. Col. Ripinsky testified that the deed was executed on the day it bears date. The witness Baldwin also says it was executed in his presence about the 2d of December, though he is not positive as to the exact day. Morris, brother of the defendant, testified that it was executed on the 2d of December. The testimony of Franklin A. Rogers, the other witness to the signature, was taken by deposition. In his deposition he says that the deed was executed and delivered about the 9th or 10th of December. It is evident that Rogers was testifying purely from memory of an event that occurred nearly 10 years before while the Ripinskys and Baldwin had the opportunity of inspecting the deed before testifying. In any event, the preponderance of the testimony seems to support the date of the instrument. As already indicated, this deed was filed for record with the United States commissioner stationed at Dyea, a town lying at the head of Lynn Canal, but at that time the commissioner at Dyea was not an ex officio recorder; the only offices established for recording in southeastern Alaska at that time being at Juneau, Sitka, and Wrangell. Haines lay in the

Juneau recording district, and the deed was subsequently filed for record in the office of the commissioner at Juneau, something more than a year after the attempted filing at Dyea. It is contended by the plaintiffs that certain alterations or additions were made to the deed subsequent to its execution. This contention is not supported by the evidence.

A few days after the execution of this deed from Mrs. Dickenson to Ripinsky, the son, William Dickenson, learned for the first time of the transaction. He thereupon armed himself with a rifle and took possession of the old buildings, demanding something for himself out of the property. The defendant, through Rogers, finally settled with him for $50, and on December 21st he executed to Ripinsky a quitclaim deed for—

"both buildings and fifteen acres of land adjoining the Presbyterian Mission, situate at Haines Mission, Alaska, except one acre of land claimed by J. Dalton."

This is the first appearance of the claim of 15 acres made by the defendant. In fact, it is the first point in the case, when the various transactions are considered chronologically, in which any other area than the 40 acres is claimed. There is nothing in the evidence to explain why 15 instead of 40 acres is attempted to be passed, when it is apparent that the intention was to convey all of the Dickensons' rights there. It is absolutely impossible to reconcile the statement and claim that George Dickenson located and claimed 40 acres during his lifetime, and that his family claimed that acreage after his death, which was made by William Dickenson on the stand, with this deed of William Dickenson (Defendant's Exhibit No. 9).

Both Col. Ripinsky and his brother, Morris, asserted that within a short time after the execution of the deed by Mrs. Dickenson, and in the month of December, they set about the construction of a two-line barbed-wire fence about the property, upon the original lines. Ripinsky testifies that, before he

purchased the property from Mrs. Dickenson, William Dick-
enson, the son, went with him over the lines of the tract and
pointed out the corner posts to him. Nowhere in Ripinsky's
testimony does it appear that he saw any of the old fence or the
wire which had been put up by Dickenson's father. On the
other hand, William Dickenson testified that he did not point
out the lines of the property to Col. Ripinsky until after Ripin-
sky had settled with him, more than three weeks after the exe-
cution of the deed by Sarah Dickenson, his mother, and that
at the time that he went over the lines with Ripinsky, at the
westerly corner, hanging from one of the posts which he
pointed out to Ripinsky, was a portion of the wire which had
been originally placed there by his father. This incident is not
mentioned by Ripinsky. The circumstances themselves, the
deed from William Dickenson to Ripinsky, and the actions of
William Dickenson, would seem to corroborate his (Dicken-
son's) testimony that it was not until after he had settled with
Ripinsky that he pointed out the old lines.

We now turn for a moment from the acts of Ripinsky to
those of the plaintiffs. On December 14th Harry Fay, ac-
companied by several other men, among them being Al. James,
John Penglass, a party named McLaughlin, and one other,
whose name Fay does not recall, went across from Chilcat to
Haines for the purpose of locating town lots; their interest in
the proposition being inspired by the railroad project. The
party was accompanied by the witness William Dickenson.
They arrived there early in the morning, and went at once to
the Mission, where they consulted W. W. Warne, who was
connected with the Haines Mission, and also talked with the
witness Dickenson as to what ground, if any, was claimed by
any one else. It is contended by plaintiffs that Dickenson
pointed out the garden surrounding the old Dickenson trading
post, and the buildings on that, as the property belonging to
his mother. The preponderance of the testimony seems to

support this assertion, though Dickenson denies it. Warne also indicated certain lots or parcels of ground which he himself had located. As already indicated, this land was heavily timbered, and this witness and all the other witnesses who were called to testify as to conditions in the winter of 1897–98 testified that the land was not cleared or improved in any way, and that it was covered with heavy timber. The men in this party proceeded to stake their lots. Fay placed a tent on the ground staked by him, marked out the boundaries, and, shortly after, proceeded to clear the ground, fence it, and put up buildings. Settlers continued to come through the balance of the winter and the spring of the following year, and in the next fall there was a considerable influx of people, due to the gold discoveries in the Porcupine.

We now turn again to the acts of Ripinsky, with regard to the building of the fence by him. Over this question of fence building there is much contradiction. Morris testifies that, within a few days after his brother obtained the deed from Mrs. Dickenson, both he and Col. Ripinsky started out, with gangs of Indians and one white man named Adolph, whose last name no one seemed to know, and who has disappeared, and proceeded to build a two-line barbed-wire fence around the property. The evidence as to this fence building is decidedly unsatisfactory and not at all convincing. On the other hand, there is no testimony, aside from theirs, of any one who saw a two-line barbed-wire fence, though there is testimony by Baldwin and Carl of having seen a barbed wire strung along the southern end at part of what was thought to be the western boundary of this tract. On the other hand, it is, I think, established beyond question that Fay and his associates went upon the ground on the 14th of December of that year, located their lines, and from that time on engaged in the work of fencing and clearing their several lots and buildings on them. As many of these lots face on Main street, or what is known as

the old Porcupine trail, close to the southern boundary of the tract claimed by Ripinsky, it seems impossible that Ripinsky and his men engaged in the building of this fence would not have encountered, or at least have seen, these settlers, or that the settlers would have seen Ripinsky and his men, at some time during that period; for under the existing conditions it would be impossible to string the wire and build the fence within a short time. And, even had they completed the fence prior to the coming of Fay and his associates, they or some one else must have seen it. The evidence as to a fence on the north side of the Porcupine trail is vague and indefinite; practically the only fence to which any one testifies being a single wire, which appears to have been a portion of the fence placed around the Haines Mission tract, and there are no witnesses who testified to having seen a fence on the north or west side, while many testified that, though they traveled back and forth over the tract in various directions during the winter of 1897–98, and the years 1898 and 1899, they never saw the fence, or any portion of it.

Defendant has failed to establish the construction of a fence about this property, and, aside from this testimony of the building of the fence, there is no testimony whatever in the case of the exercise of any acts of ownership, possession, or occupation of the land, except that in the spring of 1898 he brought an action in ejectment in the district court, entitled "Ripinsky v. Lane et al.," in which he sought to recover possession of the tract upon practically the same grounds that he here sets up in defense to this action. The plaintiffs Harry Fay, Rim Vogel, and W. W. Warne, in this action, were defendants in the action referred to. That action was tried before a jury, and a verdict returned for the defendants. It is plain from the testimony of most of the plaintiffs in the case at bar that they were cognizant of the claim of Ripinsky to the ground, though he made no formal protest against their build-

ing on the property until the year 1903. In the month of July, 1903, he sent by registered mail to a number of persons on this tract a formal protest against their building thereon, and asserting his claim to the property. No effort was made by him to maintain his fences or to reduce any portion of the tract in question, whether occupied or not, to possession, though the evidence discloses a few instances in which he, or some one representing him, made a verbal claim of ownership to some of the plaintiffs, and protested against their building thereon; but this was long after the people were in possession, and after they had commenced work upon the buildings on their lots.

One fact has, I think, considerable bearing upon the good faith of the defendant in his claim of this tract as a homestead. In 1902 he purchased from one Ben Barnette a two-story building and lot, which is described in the deed as half of lot 4, fronting on Main street, and which appears in the plat of the town (Plaintiff's Exhibit No. 1) as lot 5, block 1. While such purchases are frequently made with a view of disposing of contests over property and thus avoiding litigation, there is nothing in the acts of Col. Ripinsky, as I view the case, that indicates such a purpose in this transaction. The fact that the deed itself, which was drawn by the defendant, described the property as "situated on Sol. Ripinsky's homestead claim," does not strengthen his position; and the amended notice of location, posted some time in December, 1905, and filed in the office of the recorder at Skagway on December 18th of that year, are both made and based upon—

"the exclusive legal right to ownership of said tract through mesne conveyances and transfers thereof to this claim from the original claimants who settled upon and exclusively occupied the same, according to law, from the year 1878 to the date of the transfer, and that he claims an actual, personal, and continuous occupation thereof and settlement thereon since the month of December, 1897."

The basis of his claim, then, is the prior, actual, personal, and continuous occupation of the tract in question by his predecessors, the Northwest Trading Company and the Dickensons. It is clear that, if prior to the conveyance from Mrs. Dickenson to the defendant the Dickensons had reduced this property to possession, they would have had a possessory right in the tract which they could have conveyed to the defendant; but, before any such right accrued, they must not only have been actually resident upon the property, but they must have so cultivated and improved the land and established and maintained their boundaries by substantial posts or fences, as to reduce it to possession and give evidence to the world of what they claimed.   Price v. Brockway, 1 Alaska, 235; 26 Am. & Eng. Ency. of Law, 254; Peyton v. Desmond, 129 Fed. 1, 63 C. C. A. 651.   This possessory right can only be acquired by actual as distinguished from constructive possession, by which is meant a subjection of the land to the will and dominion of the claimant, and this is usually evidenced by substantial inclosure, by cultivation, occupation, or some other proper and appropriate use, according to the locality of the property.   26 Am. & Eng. Ency. of Law, 233, 234; English v. Johnson, 17 Cal. 108, 76 Am. Dec. 574.   There is no evidence in this case that supports the claim of possessory right to anything more than the garden plot about the buildings at the beach, and the deed from Mrs. Dickenson to Ripinsky, in my opinion, conveyed only that tract.

If, however, before the rights of the plaintiffs had accrued to this tract, this defendant had actually reduced the property to possession by some such acts as indicated above, he undoubtedly could have succeeded in this action; for the prior possession of the first occupant would be better than the subsequent possession of the last.   Walsh v. Ford, 1 Alaska, 146, 152. English v. Johnson, 17 Cal. 108, 76 Am. Dec. 574; Campbell v. Rankin, 99 U. S. 261, 25 L. Ed. 435.   But the defendant

has failed to establish any such subjection of the property or the land in controversy to his will and dominion, and it is clear that when Fay and his associates went upon the land it was public domain. It is conceded by the defendant that subsequent to the location of the first settlers, Fay and others, at Haines Mission, the defendant exercised no control over the tract; but it is urged, and with reason, that from that time the entire tract claimed by him was overrun by others, and that he could not without the exercise of force and violence have made any improvements upon the tract. Had his grantor had any rights to the property in controversy which she might have conveyed to the defendant, the situation would have been materially changed, and the entry of Fay, Warne, and others would have been an unwarranted intrusion, which could have afforded them no relief, nor could it have given them any standing. Under the facts as they appear in the evidence, in my opinion, they were rightfully upon the ground, and established their rights to the exclusion of any other rights which Ripinsky now claims to the tract, outside of that which appears on the plat marked "Plaintiff's Exhibit No. 1, Ripinsky's Homestead." This small tract has from the month of December, 1897, until the commencement of this action, been actually occupied and possessed by the defendant, and over it he has exercised acts of control and ownership which give him the exclusive right against all persons save the United States. This, however, does not extend to the larger tract.

But the defendant's counsel, in his brief, urges that there is disclosed by the evidence such multifariousness of interests on the part of the plaintiffs that the only judgment that can be rendered is one of dismissal. He points out that none of the plaintiffs claim under the same instrument or by virtue of locations made at the same time and under the same conditions. It is true that no two claim under the same instrument. It is also a fact that those claiming under original locations did not,

with a few exceptions, locate on the same day; but, on the other hand, it cannot be disputed that the claim of every plaintiff is based primarily upon possession and occupation, and the only title held by any of them is an equitable one, whether they were the first locators of the lots, or whether they bought out some prior occupant.

While "courts will not permit several complainants to demand in one bill, although against the same defendant, several matters distinct and unconnected" (15 Ency. of P. & P. 667), and such a bill is undoubtedly bad, that situation does not exist here. These plaintiffs are not demanding distinct and unconnected relief against this defendant. They seek the removal from their several holdings of the cloud raised by the defendant's claim of interest. It is only when the interests of the plaintiffs are conflicting that their joinder as parties plaintiff is objectionable. On the other hand, it is well settled that where one general right is claimed, and there is a common interest among all the plaintiffs in the subject of the suit, and the same relief is sought against the same defendants, their joinder is proper. 15 Ency. of P. & P. 668, and cases cited. The facts in the case of Utterbach v. Meeker, 16 Wash. 185, 47 Pac. 428, cited by defendant in support of his contention, are so entirely different from the facts in the case at bar as to render it, in my opinion, inapplicable.

An examination of the evidence discloses that the defendant's claim is either good or bad as against all the plaintiffs; for it is based absolutely on alleged facts and transactions which occurred prior to December 14, 1897, when the first of the location made by plaintiffs occurred. Osborne et al. v. Wis. R. R. (C. C.) 43 Fed. 824. It is patent that if, at that time, the defendant had obtained any rights in this tract, it was upon an unoccupied public domain, and, if not, then plaintiffs could establish no rights; but, if the defendant had not prior to December 14th established his rights to the tract now

claimed by him, plaintiffs must succeed, and, as this condition of affairs exists in my opinion, it follows that a decree should be entered for the plaintiffs.

As this is decisive of the suit, it seems unnecessary to consider the other questions raised by plaintiffs as to the validity of the deed by reason of the notarial acknowledgment having been taken before the grantee, who is the defendant, or as to whether or not the filing of the deed with the United States commissioner at Dyea, where no recording office was established, was sufficient notice to third parties. The plaintiffs also urge that the defendant's claim is barred because of seven years' adverse possession by the plaintiffs. This contention, too, fails, upon an examination of the evidence. Whether or not the defendant is estopped from making a claim to the tract by the judgment in the case of Ripinsky v. Lane, it is unnecessary here to decide. The pleadings and judgment in that action were, in my opinion, properly offered, and should be received in evidence. They have been considered by me, as have the two deeds (Defendants' Exhibits No. 7 and No. 9, respectively) from Sarah Dickenson and William Dickenson to the defendant. In view of the facts as found in this case, it also seems unnecessary to discuss with particularity in this opinion the subject of the various lots claimed by the plaintiffs.

The decree should be entered in favor of the plaintiffs.