**ATLANTIS DEVELOPMENT CORPORATION, Ltd., Appellant,**

v.

**UNITED STATES of America et al., Appellees.**

No. 22958.

United States Court of Appeals Fifth Circuit.

June 12, 1967.

Louis W. Adams, Jr., Fort Lauderdale, Fla., J. Francis Hayden, New York City, for appellant.

Charles E. Davis, Orlando, Fla., Aaron A. Foosaner, First Asst. U. S. Atty., Miami, Fla., Roger P. Marquis, George S. Swarth, Attys., Dept. of Justice, Washington, D. C., for appellees.

Before TUTTLE, Chief Judge, and BROWN and GODBOLD, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

This case involves a little bit of nearly everything—a little bit of oceanography, a little bit of marine biology, a little bit of the tidelands oil controversy, a little bit of international law, a little bit of latter day Marco Polo exploration. But these do not command our resolution since the little bits are here controlled by the less exciting bigger, if not big, problem of intervention. The District Court declined to permit mandatory intervention as a matter of right or to allow intervention as permissive. (As is so often true, a ruling made to avoid delay, complications, or expense turns out to have generated more of its own. With the main case being stayed by the District Court pending this appeal, it is pretty safe to assume that the case would long have been decided on its merits (or lack of them) had intervention of either kind been allowed. And this seems especially unfortunate since it is difficult to believe that the presence of the attempted intervenor would have added much to the litigation. All of this becomes the more ironic, if not unfortunate, since the in-

tervenor [1] and the Government sparring over why intervention ought or ought not to have been allowed, each try to persuade us the one was bound to win, the other lose on the merits which each proceeds to argue as though the parties were before or in the court. Adding to the problem, or perhaps more accurately, aiding in the solution of it, are the mid-1966 amendments to the Federal Rules of Civil Procedure including specifically those relating to intervention. We reverse.

What the jousting [2] is all about is the ownership in, or right to control the use, development of and building on a number of coral reefs or islands comprising Pacific Reef, Ajax Reef, Long Reef, an unnamed reef and Triumph Reef which the intervenor has called the "Atlantis Group" because of the name given them by Anderson, its predecessor in interest and the supposed discoverer. Discovery in the usual sense of finding a land area, continent or island heretofore unknown could hardly fit this case. For these reefs are, and have been for years, shown on Coast and Geodetic Charts [3] and, more important, they are scarcely 4½ miles off Elliott Key and 10 miles off the Coast off the Florida Mainland. Although the depth of water washing over them at mean low water is likely one of the factual controversies having some possible significance, it seems undisputed that frequently and periodically the bodies of these reefs become very apparent especially in rough seas when the rock or the top surface of the rock becomes plainly visible in the troughs of the seas.

Just how or in what manner these reefs were "discovered" is so far unrevealed. Some time in 1962 William T. Anderson discovered the reefs apparently by conceiving the idea of occupying them through the construction of facilities for fishing club, marina, skin diving club, a hotel, and, perhaps as the chief lure, a gambling casino. Anderson made some sort of claim to it and with facilities unavailable to the adventurous explorers of the long past, he gave public notice of this in the United States and in England by newspaper advertisements in late 1962 and early 1963. These "rights" were acquired by Atlantis Development Corporation, Ltd., the proposed intervenor. Reflecting the desire manifested now by the persistent efforts to intervene to have legal rights ascertained in a peaceful fashion through established tribunals and not by self-help or the initiation of physical activities which would precipitate counter moves, physical or legal, or both, Atlantis (and predecessors) patiently sought permission from all governmental agencies, state and federal—just short of the United Nations—but to no avail. The State of Florida through the Trustees of the Internal Improvement Fund [4] responding to a formal request stated that the property is "outside the Constitutional Boundaries of the State of Florida and therefore, not within the jurisdiction of the T.I.I.F." Undaunted, Atlantis turn-

---

1. Atlantis Development Corporation, Ltd., a Bahamian corporation, will be referred to interchangeably as either Atlantis or Intervenor.

2. The "facts" are as yet unknown since no trial of either the main or the intervention case has been had. They are revealed in this record solely in the complaint, the answer, the proposed intervention, and supporting affidavit which in turn incorporated a detailed 32-page memorandum previously filed by the intervenor's counsel with the Office of Chief of Engineers, Department of Defense. This opinion must begin and end therefore with the caveat that nothing said or unsaid, expressed or implied, is even a re-

mote, possible whisper of a suggestion as to what the merits (or demerits) might ultimately be. Cf. J. M. Huber Corp. v. Denman, 5 Cir., 1966, 367 F.2d 104, 120–121. Discussion of such asserted facts and the legal theories is merely to illumine the factors bearing upon intervention, as of right or permissive.

3. They first appeared on U.S. Coast & Geodetic Survey Chart No. 166, issued in 1878. More recently, see Coast & Geodetic Survey Chart No. 1249, as corrected through June 1, 1963.

4. See Fla.Stat. ch. 253 (1965). The lands with which the Trustees are charged with administration and control are set out in Fla.Stat. § 253.03 (1965) F.S.A.

ed to the Federal Government. To these entreaties the Department of Interior on September 14, 1962, replied: "The Department of the Interior has no jurisdiction over land that is outside the territorial limits of the United States. Questions concerning such land should be taken up with the Department of State." This was soon echoed by the answer of the Department of State on November 9, 1962, through the Assistant Legal Advisor. "The areas in question are outside of the jurisdiction of the United States and constitute a part of the high seas. The high seas are open to all nations and no state may validly subject any part of them to its sovereignty. * * *." Subsequently, Atlantis spent approximately $50,000 for surveys and the construction of four prefabricated buildings, three of which were destroyed by a hurricane in September 1963. Thereafter upon learning that the United States Corps of Engineers was asserting that permission was needed to erect certain structures on two of the reefs, Triumph and Long Reef, Atlantis commenced its long, but unrewarding, efforts either to convince the Corps of Engineers, the United States Attorney General, or both, that the island reefs were beyond the jurisdiction of United States control or to initiate litigation which would allow a judicial, peaceful resolution. The Engineers ultimately reaffirmed the earlier decision to require permits. In December 1964 on learning that the defendants in the main case had formally sought a permit from the Engineers, Atlantis notified the Government of its claim to ownership of the islands and the threatened unauthorized actions by the defendants. This precipitated further communications with the Department of Justice with Atlantis importuning, apparently successfully, the Government to initiate the present action.

It was against this background that the litigation commenced. The suit is brought by the United States against the main defendants.[5] The complaint was in two counts seeking injunctive relief. In the first the Government asserted that Triumph and Long Reefs are part of the bed of the Atlantic Ocean included in the Outer Continental Shelf subject to the jurisdiction, control and power of disposition of the United States. The action of the defendants (note 5, supra) in the erection of caissons on the reefs, the dredging of material from the seabed, and the depositing of the dredged material within the caissons without authorization was charged as constituting a trespass on government property. In the second count the Government alleged that the defendants were engaged in the erection of an artificial island or fixed structure on the Outer Continental Shelf in the vicinity of the reefs without a permit from the Secretary of the Army in violation of the Outer Continental Shelf Lands Act, 43 U.S.C.A. § 1333(f) and 33 U.S.C.A. § 403. Denying that the complaint stated a claim, F.R.Civ.P. 12 (b), the defendants besides interposing general denial asserted that the Secretary of the Army lacks jurisdiction to require a permit for construction on the Outer Continental Shelf and that the District Court lacks jurisdiction since the reefs and the defendants' actions thereon are outside the territorial limits of the United States. As thus framed, the issues in the main case are whether (1) the District Court has jurisdiction of subject matter, (2) the defendants are engaged in acts which constitute a trespass against government property, and (3) the defendants' construction activities without a permit violate 43 U.S.C.A. § 1333(f) and 33 U.S.C.A. § 403.[6]

Atlantis seeking intervention by proposed answer and cross-claim against the defendants admitted the jurisdiction of the District Court. It asserted that the United States has no territorial jurisdiction, dominion or ownership in or over

---

5. Acme General Contractors, Inc., and J. H. Coppedge Company, each Florida corporations, and Louis M. Ray, a resident of Dade County, Florida.

6. Issues (2) and (3) comprehend items (a), (b) and (c) in the prayer of intervenor's proposed answer. See note 7, infra.

the reefs and cannot therefore maintain the action for an injunction, and that conversely Atlantis has title to the property by discovery and occupation. In the cross-claim, Atlantis charged the defendants as trespassers against it. Appropriate relief was sought by the prayer.[7]

The District Court without opinion declared in the order that intervenor "does not have such an interest in this cause as will justify its intervention, either as a matter of right or permissively." Leave was granted to appear amicus curiae.

■ We think without a doubt that under former F.R.Civ.P. 24(a), intervention as a matter of right was not compelled under (a) (2).[8] The situation did not present one in which the intervenor "is or may be bound" by a decree rendered in his absence in the sense articulated most recently in *Sam Fox* [9] in terms of res judicata. Although not quite so clear, we also think it did not measure up to the notions loosely reflected in a case-by-case development under which, although res judicata was technically lacking, the decree is considered "binding" since in a very practical sense it would have an immediate operative effect upon the intervenor.[10] In none of these cases was it suggested that if the only effect of the decree in intervenor's absence would be to raise the hurdle of stare decisis, this would amount to the absentee being bound as a practical matter.[11]

■ This brings us squarely to the effect of the 1966 Amendments and the

7. It sought judgment adjudicating and determining (a) the rights of the parties to this action and those of the intervenor; (b) that the Government has no territorial jurisdiction over or ownership in Triumph Reef; (c) that the Secretary of Defense has no power to require application and permit for construction on the reefs; (d) that Atlantis has the paramount right, title and interest in the reefs; and that (e) the defendants have none.

8. F.R.Civ.P. 24. Intervention
   "(a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the representation of the applicant's interest by existing parties is or may be inadequate and the applicant is or may be bound by a judgment in the action; or (3) when the applicant is so situated as to be adversely affected by a distribution or other disposition of property which is in the custody or subject to the control or disposition of the court or an officer thereof.
   "(b) Permissive Intervention. Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common. * * * In exercising its discretion the court shall con-

sider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties."

9. Sam Fox Publishing Co. v. United States, 1961, 366 U.S. 683, 81 S.Ct. 1309, 6 L. Ed.2d 604.

10. Ford Motor Co. v. Bisanz Bros., Inc., 8 Cir., 1957, 249 F.2d 22; Kozak v. Wells, 8 Cir., 1960, 278 F.2d 104, 84 A.L.R. 2d 1400; Atlantic Ref. Co. v. Standard Oil Co., 1962, 113 U.S.App.D.C. 20, 304 F.2d 387, 393; International Mortgage & Inv. Corp. v. Von Clemm, 2 Cir., 1962, 301 F.2d 857; Textile Workers Union v. Allendale Co., 1955, 96 U.S.App.D.C. 401, 226 F.2d 765, 767, cert. denied, 1956, 351 U.S. 909, 76 S.Ct. 699, 100 L.Ed. 1444, expressly approved in International Union, UAW v. Scofield, 1965, 382 U.S. 205, 86 S.Ct. 373, 15 L.Ed.2d 272 at 280, n. 10; Wolpe v. Poretsky, 1944, 79 U.S. App.D.C. 141, 144 F.2d 505, cert. denied, 323 U.S. 777, 65 S.Ct. 188, 89 L.Ed. 621.

11. See, e. g., Stadin v. Union Electric Co., 8 Cir., 1962, 309 F.2d 912, 918, cert. denied, 1963, 373 U.S. 915, 83 S.Ct. 1298, 10 L.Ed.2d 415, distinguishing its prior *Kozak* and *Ford Motor* cases (note 10, supra): "Liberality, however, does not equate with rights of indiscriminate intervention. The applicant must still meet the requirement that he 'is or may be bound' by the judgments. * * * The presence or possibility of difficulty, even great difficulty, is not enough."

new F.R.Civ.P. 24(a).[12] Before examining its intrinsic meaning and purpose, the question arises, of course, whether in testing action taken in June 1965, amendments effective July 1, 1966, should be invoked. The order of the Supreme Court approving the Rules affords the guide.[13] As we did most recently with amended F.R.Civ.P. 23 on class actions, Alvarez v. Pan American Life Ins. Co., 5 Cir., 375 F.2d 992 [No. 22761, Mar. 27, 1967], and more significant, as did the Supreme Court in *El Paso II*,[14] we think it appropriate that to the maximum extent possible, the amended Rules should be given retroactive application.

■ Certainly that should be true here. For here no possible intrinsic prejudice can occur. Nothing has happened in this case since the filing of the pleadings. The further action has been stayed pending determination of whether intervention should be permitted in the case yet to be tried. Except for the irrelevant circumstance that this apparently puts the trial Judge in error by subsequent events for a decision which presumably was correct at the time made, there is no reason why we ought not to judge this question in the light of today's standards. Certainly that is the general aim of the Rules that they "shall be construed to secure the just, speedy and inexpensive determination of every action." F.R.Civ.P. 1.

In assaying the new Rule, several things stand out. The first, as the Government acknowledges, is that this amounts to a legislative repeal of the rigid *Sam Fox* (note 9, supra) [15] res

12. "(a) *Intervention of Right.* Upon timely application anyone shall be permitted to intervene in any action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an *interest relating to the property or transaction which is the subject of the action* and he is so situated that the *disposition of the action may as a practical matter impair or impede his ability to protect that interest,* unless the applicant's interest is adequately represented by existing parties." [Emphasis added.]
Rule 24(a), F.R.Civ.P., as amended July 1, 1966 (U.S.Code Cong. & Adm.News, 89th Cong., 2d sess., No. 3, Apr. 5, 1966, 799. See also 39 F.R.D. 69, 109–111; Cohn, The New Federal Rules of Civil Procedure, Essays reprinted from Geo. L.J. 7, 32–35 (1966).

13. It is "Ordered"
"2. That the foregoing amendments and additions to the Rules of Civil Procedure shall take effect on July 1, 1966 and shall govern all proceedings in actions brought thereafter and also in all further proceedings in actions then pending, except to the extent that in the opinion of the Court their application in a particular action then pending would not be feasible or would work injustice, in which event the former procedure applies."
383 U.S. 1031, 15 L.Ed.2d lxxv.

14. Cascade Natural Gas Corp. v. El Paso Natural Gas Co., 1967, 386 U.S. 129, 87 S.Ct. 932, 17 L.Ed.2d 814, and see especi-

ally as to new Rule 24(a) (2) 386 U.S. at 132, 87 S.Ct. at 935, 17 L.Ed.2d at 818–819.

15. 39 F.R.D. 69, 110: Advisory Committee Notes.
"Original Rule 24(a) (2), however, made it a condition of intervention that 'the applicant is or may be bound by a judgment in the action,' and this created difficulties with intervention in class actions. * * * See Sam Fox Publishing Co. v. United States, 366 U.S. 683 [81 S.Ct. 1309, 6 L.Ed.2d 604] (1961) * * *. This reasoning might be linguistically justified by original Rule 24(a) (2); but it could lead to poor results. Compare the discussion in International M. & I. Corp. v. Von Clemm, 301 F.2d 857 (2d Cir. 1962); Atlantic Refining Co. v. Standard Oil Co., 113 U.S.App.D.C. 20, 304 F.2d 387 (D.C.Cir. 1962). [See note 10, supra] * * *.
"The amendment provides that an applicant is entitled to intervene in an action when his position is comparable to that of a person under Rule 19(a) (2) (i), as amended, unless his interest is already adequately represented in the action by existing parties. The Rule 19(a) (2) (i) criterion imports practical considerations, and the deletion of the 'bound' language similarly frees the rule from undue preoccupation with strict consideration of *res judicata.*"
See also Stewart, J., dissenting, *El Paso II,* supra, note 14: "The purpose of the revision was to remedy certain logical shortcomings in the construction

judicata rule. But more important, the revision was a coordinated one to tie more closely together the related situations of joinder, F.R.Civ.P. 19,[16] and class actions, F.R.Civ.P. 23.[17]

As the Advisory Committee's notes reflect, there are competing interests at work in this area. On the one hand, there is the private suitor's interests in having his own lawsuit subject to no one else's direction or meddling. On the other hand, however, is the great public interest, especially in these explosive days of ever-increasing dockets, of having a disposition at a single time of as much of the controversy to as many of the parties as is fairly possible consistent with due process.[18]

In these three Rules the Advisory Committee, unsatisfied with the former Rules which too frequently defined application in terms of rigid legal concepts such as joint, common ownership, res judicata, or the like, as well as court ef-

---

of the former 24(a) (2), see Sam Fox Publishing Co. v. United States, * * *." 386 U.S. at 153, 87 S.Ct. at 946, 17 L.Ed. 2d at 829.

16. F.R.Civ.P. 19 was completely rewritten:

"Joinder of Persons Needed for Just Adjudication

"(a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) *he claims an interest relating to the subject of the action* and is so situated that the *disposition of the action in his absence may* (i) *as a practical matter impair or impede his ability to protect that interest* or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and his joinder would render the venue of the action improper, he shall be dismissed from the action.

"(b) Determination by Court Whenever Joinder not Feasible. * * *

"(c) Pleading Reasons for Nonjoinder. A pleading asserting a claim for relief shall state the names, if known to the pleader, of any persons as described in subdivision (a) (1)—(2) hereof who are not joined, and the reasons why they are not joined.

"(d) Exception of Class Actions. This rule is subject to the provisions of Rule 23." [Emphasis added.] 39 F.R.D. 69, 88–89. See discussion by Cohn, supra, note 12, at pp. 7–14.

17. Likewise Rule 23 was completely rewritten. See Alvarez v. Pan American Life Ins. Co., 5 Cir., 1967, 375 F.2d 992 at 995 & n. 3 [No. 22761, Mar. 27, 1967]. After specifying that for actions meeting the prerequisites of a class action set forth in 23(a), subpar. (b) provides that a class action may be maintained if in addition:

"(1) [T]he prosecution of separate actions by or against individual members of the class would create a risk of
" * * *

"(B) adjudications with respect to individual members of the class which would *as a practical matter* be dispositive of the interests of the other members not parties to the adjudications or *substantially impair or impede their ability to protect their interests;* * * *." [Emphasis added.] 39 F.R.D. 69, 96. See Cohn, supra note 12, at pp. 16–19.

18. See, e.g., notes to F.R.Civ.P. 19. "New *subdivision (a)* defines the persons whose joinder in the action is desirable. * * * The interests that are being furthered here are not only those of the parties, but also that of the public in avoiding repeated lawsuits on the same essential subject matter. * * *." 39 F.R.D. 69, 91.

This Court has recently voiced the same objectives:

"The Rules allow joinder in such a case as the present; indeed in order to prevent costly, slow, multiplicitous litigation (with the danger of inconsistent results), they demand it. The Supreme Court has recently held that 'Under the Rules, the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged.' United Mine Workers of America v. Gibbs, 1966, 383 U.S. 715, 724, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218, 227."

Har-Pen Truck Lines, Inc. v. Mills, 5 Cir., 1967, 378 F.2d 705, 709.

forts in applying them, deliberately set out on a more pragmatic course.[19] For the purposes of our problem, this course is reflected in the almost, if not quite, uniform language concerning a party who claims an interest relating to the subject of the action and is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest (see the italicized portions of Rules 19(a) (2) (i), 24 and 23(b) (1) (B), notes 16, 12, and 17, supra).

■ Although this is question-begging and is therefore not a real test, this approach shows that the question of whether an intervention as a matter of right exists often turns on the unstated question of whether joinder of the intervenor was called for under new Rule 19. Were this the controlling inquiry, we find ample basis here to answer it in the affirmative. Atlantis—having formally informed the Government in detail of its claim of ownership to the very reefs in suit, that the defendants were trespassing against it, and having successfully urged the Government to institute suit against the defendants—seems clearly to occupy the position of a party who ought to have been joined as a defendant under new Rule 19(a) (2) (i) [see the italicized portion of note 16, supra].

■ This interim conclusion is, of course, a rejection of the Government's approach made for this day, case, and time only that all new Rule 24(a) was to do was to abandon the rigidity of *Sam Fox* and codify the ameliorative exceptions (see note 10, supra) to escape

the unfortunate consequences of a rule expressed in terms of the party being "bound," i. e., res judicata. Any such narrow approach is to deprecate the painstaking work of the Advisory Committee especially the deliberate efforts to dovetail F.R.Civ.P. 19, 24 and 23 together with two of them being radically rewritten.

■■ When approached in this light, we think that both from the terms of new Rule 24(a) and its adoption of 19(a) (2) (i) intervention of right is called for here. Of course F.R.Civ.P. 24(a) (2) requires both the existence of an interest which may be impaired as a practical matter and an absence of adequate representation of the intervenor's interest by existing parties. There can be no difficulty here about the lack of representation. On the basis of the pleadings, see Kozak v. Wells, 8 Cir., 1960, 278 F.2d 104, 109, 84 A.L.R.2d 1400; cf. Stadin v. Union Electric Co., 8 Cir., 1962, 309 F.2d 912, 917, cert. denied, 1963, 373 U. S. 915, 83 S.Ct. 1298, 10 L.Ed.2d 415, Atlantis is without a friend in this litigation. The Government turns on the defendants and takes the same view both administratively and in its brief here toward Atlantis. The defendants, on the other hand, are claiming ownership in and the right to develop the very islands claimed by Atlantis.

Nor can there be any doubt that Atlantis "claims an interest relating to the property or transaction which is the subject of the action."[20] The object of the suit is to assert the sovereign's exclusive dominion and control over two out of a

19. See, e.g., Advisory Committee Notes to Rule 19: "Clause (2) (i) recognizes the importance of protecting the person whose joinder is in question against the practical prejudice to him which may arise through a disposition of the action in his absence." 39 F.R.D. 69, 91.

See similar comments as to F.R.Civ.P. 24, note 15, supra, especially the following which warrants repeating: "The amendment provides that an applicant is entitled to intervene in an action when his position is comparable to that of a person under Rule 19(a) (2) (i), as amended, unless his interest is already

adequately represented in the action by existing parties."

As to Rule 23(b) (1) (B) "[t]his clause takes in situations where the judgment in a nonclass action by or against an individual member of the class, while not technically concluding the other members, might do so as a practical matter. The vice of an individual action would lie in the fact that the other members of the class, thus practically concluded, would have had no representation in the lawsuit." 39 F.R.D. 69, 100–101.

20. 24(a) (2), note 12, supra.

group of islands publicly claimed by Atlantis. This identity with the very property at stake in the main case and with the particular transaction therein involved (the right to build structures with or without permission of the Corps of Engineers) is of exceptional importance. For 24(a) (2) is in the conjunctive requiring both an interest relating to the property or transaction and the practical harm if the party is absent. This sharply reduces the area in which stare decisis may, as we later discuss, supply the element of practical harm.

This brings us then to the question whether these papers reflect that in the absence of Atlantis, a disposition of the main suit may as a practical matter impair or impede its ability to protect that interest—its claim to ownership and the right to control, use and develop without hindrance from the Government, the Department of Defense, or other agencies. Certain things are clear. Foremost, of course, is the plain proposition that the judgment itself as between Government and defendants cannot have any direct, immediate effect upon the rights of Atlantis, not a party to it.

But in a very real and practical sense is not the trial of this lawsuit the trial of Atlantis' suit as well? Quite apart from the contest of Atlantis' claim of sovereignty vis-a-vis the Government resulting from its "discovery" and occupation of the reefs,[21] there are at least two basic substantial legal questions directly at issue, but not yet resolved in any Court at any time between the Government and the defendants which are inescapably present in the claim of Atlantis against the Government. One is whether these coral reefs built up by accretion of marine biology are "submerged lands" under the Outer Continental Shelf Lands Act, 43 U.S.C.A. § 1331 et seq.[22] The second basic question is whether, assuming both from the standpoint of geographical location and their nature they constitute "lands," does the sovereignty of the United States extend to them with respect to any purposes not included in or done for the protection of the "exploring for, developing, removing, and transporting * * *" natural resources therefrom, 43 U.S.C.A. § 1333(a) (1).[23] Another, closely related, is whether the authority of the Secretary of the Army

21. Atlantis cites the following authorities to support its contention that it could acquire a valid title by this discovery and occupation: United States v. Fullard-Leo, 9 Cir., 1943, 133 F.2d 743, 746, reversing D.C.Haw., 1940, 66 F.Supp. 774, cert. denied Hawaii v. Fullard-Leo, 319 U.S. 748, 63 S.Ct. 1157, 87 L.Ed. 1703, on remand, D.C., 66 F.Supp. 782, aff'd 9 Cir., 156 F.2d 756, aff'd 331 U.S. 246, 67 S.Ct. 1287, 91 L.Ed. 1474; Jacobsen v. Norwegian Government, Norske Retstidende, p. 511 (Supp.Ct. of Norway, May 3, 1933), reported in Lauterpacht, Digest of Public International Law Cases (1933–34), Case No. 42, at p. 109 (Butterworth & Co., Ltd., London 1940); Hinchman v. Rapinsky, 3 Alaska 543 (1908); The Swains Island Case (1856) reported in 1 Hackworth, Digest of International Law, Sec. 73, p. 482 (U.S. Government Printing Office 1940); Martin v. Waddell, 41 U.S. 367, 16 U.S. 367, 409, 10 L.Ed. 997 (1842) (opinion by Taney, C.J.); Johnson v. M'Intosh, 8 Wheat. 543, 8 U.S. 543, 595, 5 L.Ed. 681 (1823) (opinion by Marshall, C.J.); 1 Hyde, International Law 392 (2d ed. 1945); Lawrence, Principles of International Law 148 (7 ed.

1923); 1 Moore, International Law Digest 258 (1906); Von Der Heydte, "Discovery, Symbolic Annexation and Virtual Effectiveness in International Law," 29 Am.J.Int'l L. 448, 450, 468 (1939); Simsarian, "The Acquisition of Legal Title to Terra Nullius," 53 Pol.Sci.Q. 128 (1938).

22. "§ 1331. Definitions
"When used in this subchapter—
"(a) the term 'outer Continental Shelf' means all submerged lands lying seaward and outside of the area of lands beneath navigable waters as defined in section 1301 of this title, and of which the subsoil and seabed appertain to the United States and are subject to its jurisdiction and control; * * *."

23. § 1333(a) (1). "The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands and fixed structures which may be erected thereon for the *purpose* of *exploring for, developing,* removing, and transporting *resources therefrom,* to the same extent as if the outer Continental Shelf

to prevent obstruction of navigation extended by § 1333(f) to "artificial islands and fixed structures,"[24] includes structures other than those "erected thereon for the purpose of exploring for, developing, removing, and transporting" mineral resources therefrom (§ 1333(a)(1), note 23, infra).

The Government would avoid all of these problems by urging us to rule as a matter of law on the face of the moving papers that the intervenors could not possibly win on the trial of the intervention and consequently intervention should be denied. In support it asserts that the claim that the reefs are beyond the jurisdiction of the United States is self-defeating, and under the plain meaning of the Outer Continental Shelf Lands Act and the facts revealed from the Coast and Geodetic Chart[25] of which we must take judicial knowledge as proof of all facts shown.[26]

The first is at least contingently answered by § 1333(b) which invests jurisdiction in the United States District Court of the nearest adjacent state. As to the others, it is, of course, conceivable that there will be some instances in which the total lack of merit is so evident from the face of the moving papers that denial of the right of intervention rests upon a complete lack of a substantial claim. But it hardly comports with good administration, if not due process, to determine the merits of a claim asserted in a pleading seeking an adjudication through an adversary hearing by denying access to the court at all. This seems especially important when dealing with interests in the outer Continental Shelf in view of the legislative history which reflected domestically the purpose of asserting a limited "horizontal jurisdiction"[27] extending only to the seabed and subsoil, the limited nature of which was formally recognized by the International Conven-

were an area of exclusive Federal jurisdiction located within a State: * * *."

Since natural resources is not directly defined there is inescapably involved in all of these inquiries the further one of whether the exclusionary language in § 1302 of the Submerged Lands Act, 43 U.S.C.A. §§ 1301–1315, has the effect of incorporating within the Outer Continental Shelf Lands Act the definition in the former of "natural resources." It reads: 43 U.S.C.A. § 1301(e). "The term 'natural resources' includes, without limiting the generality thereof, oil, gas, and all other minerals, and fish, shrimp, oysters, clams, crabs, lobsters, sponges, kelp, and other marine, animal and plant life but does not include water power, or the use of water for the production of power."

24. § 1333(f). "The authority of the Secretary of the Army to prevent obstruction to navigation in the navigable waters of the United States is extended to artificial islands and fixed structures located on the Outer Continental Shelf."

Presumably this incorporates by reference § 10 Rivers and Harbors Act of 1899, 30 Stat. 1121, 1151, as amended 33 U.S.C.A. § 403.

25. The Geodetic Chart shows the 100-fathom (600-foot) line—the seaward limit to the Outer Continental Shelf—is about three miles seaward of these reefs.

26. The Government urges Pfeifer Oil Transp. Co. v. The Ira S. Bushey, 2 Cir., 1942, 129 F.2d 606, 607; Krench v. United States, 6 Cir., 1930, 42 F.2d 354, 355. They cite also United States v. Romaine, 9 Cir., 1919, 255 F. 253, where the Court states that "We think the [United States Coast and Geodetic Survey Charts] should be given full credence, and should be taken as absolutely establishing the truth of all that they purport to show." 255 F. at 254.

27. See § 1332(b). "This subchapter shall be construed in such manner that the character as high seas of the waters above the outer Continental Shelf and the right to navigation and fishing therein shall not be affected." Guess v. Read, 5 Cir., 1961, 290 F.2d 622, cert. denied, 1962, 368 U.S. 957, 82 S.Ct. 394, 7 L.Ed. 2d 388, cf. Pure Oil Co. v. Snipes, 5 Cir., 1961, 293 F.2d 60, 63. See S.Rep. No. 411, 83rd Cong., 1st Sess.: "In §§ 3(a) and 4(a) (1), the jurisdiction and plenary control of the United States is extended to the seabed and subsoil of entire outer Continental Shelf adjacent to the shores of the United States instead of merely to the natural resources of the subsoil and seabed and to structures for their development * * *. * * * * At the same time, an amendment to the wording of Section 3(b) makes abundantly clear the unequivocal legislative intent of the

tion on the Continental Shelf.[28] See United States v. State of Louisiana, Texas, Mississippi, Alabama and Florida, 1960, 363 U.S. 1, 30–31, 80 S.Ct. 961, 979, 4 L.Ed.2d 1025, 1046.

If in its claim against the defendants in the main suit these questions are answered favorably to the Government's position, the claim of Atlantis for all practical purposes is worthless. That statement assumes, of course, that such holding is either approved or made by this Court after an appeal to it and thereafter it is either affirmed, or not taken for review, on certiorari. It also assumes that in the subsequent separate trial of the claim of Atlantis against the Government[29] the prior decision would be followed as a matter of stare decisis. Do these assumptions have a realistic basis? Anyone familiar with the history of the Fifth Circuit could have but a single answer to that query. This Court, unlike some of our sister Circuit Courts who occasionally follow a different course, has long tried earnestly to follow the practice in which a decision announced by one panel of the Court is followed by all others until such time as it is reversed, either outright or by intervening decisions of the Supreme Court, or by the Court itself en banc.[30] That means that if the defendants in the main action do not prevail upon these basic contentions which are part and parcel of the claim of Atlantis, the only way by which Atlantis can win is to secure a rehearing en banc with a successful overruling of the prior decision or, failing in either one or both of those efforts, a reversal of the earlier decision by the Supreme Court on certiorari. With the necessarily limited number of en banc hearings in this Circuit[31] and with the small percentage of cases meriting certiorari,[32] it is an understatement to characterize these prospects as formidable.

■■ That is but a way of saying in a very graphic way that the failure to allow Atlantis an opportunity to advance

---

committee that the jurisdiction asserted is a 'horizontal jurisdiction', extending only to the seabed and subsoil, and does not in any wise affect the character as high seas of the waters above that seabed and subsoil nor their use with respect to navigation and fishing."

**28.** Treaties and Other International Acts Series No. 5578 (1964), adopted at Geneva April 29, 1958, signed on behalf of the United States September 15, 1958, approved by the Senate on May 26, 1960 (106 Cong.Rec. 11182–83) ratified by the President on March 24, 1961 (44 State Dep't Bull. 609) and entered into force June 10, 1964 (50 State Dep't Bull. 946).
The Convention provides:
"Article 2.
"1. The coastal State exercises the continental shelf sovereign rights for the purpose of exploring it and exploiting its natural resources."
Par. 4 defines "natural resources," see note 23, supra.

**29.** Whatever difficulty there might be about a suit by Atlantis to challenge the Government's title to the reefs, there is none as to the controversy over whether these are outer Continental Shelf lands and whether the Corps of Engineers' permit is required. Both the Secretary of the Army and the Secretary of the De-

fense are amenable to suit everywhere including the Southern District of Florida, 28 U.S.C.A. §§ 1361, 1391(e), and see notes to Rule 19, 39 F.R.D. 69, 96.

**30.** As to the related problem of the law of the case, see Lincoln Nat. Life Ins. Co. v. Roosth, 5 Cir., 1962, 306 F.2d 110 (en banc), cert. denied, 372 U.S. 912, 83 S. Ct. 726, 9 L.Ed.2d 720.

**31.** See Alexander, En Banc Hearings in the Federal Courts of Appeals: Accommodating Institutional Responsibilities, 40 N.Y.U.L. Rev. 563 & 726 (1965).

**32.** Of the 1,164 petitions for certiorari (not in forma pauperis) on the appellate docket of the Supreme Court for the 1965–1966 term, only 124 or approximately 12% were granted with 140 petitions left on the docket at the end of the term. For the past decade, the percentage of petitions granted has varied between 12 and 17% but the trend is clearly a declining percentage since, while the number of petitions filed is increasing, those granted is relatively constant and presumably limited by the work-capacity of the Court. 1966 Annual Report of the Director of the Administrative Office of the United States Courts Table A–1 at 147. See also Statistics for 1965–1966 term in 35 L.W. 3028.

its own theories both of law and fact in the trial (and appeal) of the pending case will if the disposition is favorable to the Government "as a practical matter impair or impede [its] ability to protect [its] interest." That is, to be sure, a determination by us that in the new language of 24(a) (2) stare decisis may now—unlike the former days under 24 (a) (2)—supply that practical disadvantage which warrants intervention of right. It bears repeating,[33] however, that this holding does not presage one requiring intervention of right in every conceivable circumstance where under the operation of the Circuit's stare decisis practice, the formidable nature of an en banc rehearing or the successful grant of a writ of certiorari, an earlier decision might afford a substantial obstacle. We are dealing here with a conjunction of a claim to and interest in the very property and the very transaction which is the subject of the main action. When those coincide, the Court before whom the potential parties in the second suit must come must itself take the intellectually straight forward, realistic view that the first decision will in all likelihood be the second and the third and the last one. Even the possibility that the decision might be overturned by en banc ruling or reversal on certiorari does not overcome its practical effect, not just as an obstacle, but as the forerunner of the actual outcome. In the face of that, it is "as a practical matter" a certainty that an absent party seeking a right to enter the fray to advance his interest against all or some of the parties as to matters upon which he is for all practical purposes shortly to be foreclosed knows the disposition in his absence will "impair or impede his ability to protect that interest, * * *." F.R.Civ.P. 24(a) (2).[34]

Reversed.

33. See note 20, supra, and related text.

34. Ending, as we began, with the caveat, see note 2, supra, that in outlining what may be at stake we have decided nothing except the right to intervene, we must take note also of the Government's contention that intervention should be denied because this is an unconsented suit against the United States. It relies particularly on United States v. Dry Dock Savings Inst., 2 Cir., 1945, 149 F.2d 917; United States v. Great Northern Ry., D. C.Mont., 1940, 32 F.Supp. 651, affirmed sub. nom. MacDonald v. United States, 9 Cir., 1941, 119 F.2d 821, modified on other matters and affirmed, Great Northern Ry. v. United States, 1942, 315 U.S. 262, 62 S.Ct. 529, 86 L.Ed. 836; see also United States v. Sherwood, 1941, 312 U.S. 584, 589–590, 61 S.Ct. 767, 85 L.Ed. 1058; Humble Oil & Ref. Co. v. Sun Oil Co., 5 Cir., 1951, 190 F.2d 191, 197, rehearing denied, 1951, 191 F.2d 705, cert. denied, 1952, 342 U.S. 920, 72 S.Ct. 367, 96 L.Ed. 687. This is a matter for determination on the merits on remand. Intervention to be available does not have to be against every party. There is ample diversity jurisdiction as between Atlantis and the main defendants (see notes 1 and 5, supra), and lack of consent, sovereignty immunity, or related problems may wash out by the addition of new parties who are now amenable. See note 29, supra.