TREASURE SALVORS, INC., a corporation, and Armada Research Corp., a corporation, Plaintiffs,

v.

The UNIDENTIFIED WRECKED AND ABANDONED SAILING VESSEL, her tackle, armament, apparel and cargo located within 2500 yards of a point at coordinates 24.31.5′ north latitude and 82.50 west longitude, said SAILING VESSEL is believed to be the NUESTRA SENORA de ATOCHA, Defendant.

No. 75–1416–Civ–WM.

United States District Court, S. D. Florida.

Aug. 21, 1978.

510

David P. Horan, Key West, Fla., for plaintiffs.

Robert L. Shevin, Atty. Gen., by Bernard S. McLendon, Asst. Atty. Gen., Dept. of Legal Affairs, Civ. Div., Tallahassee, Fla., for defendant.

## ORDER

### MEMORANDUM INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW

MEHRTENS, Senior District Judge.

### INTRODUCTORY STATEMENT AND CONCLUSIONS OF LAW

This proceeding follows the receipt of the mandate from the United States Court of Appeals in *Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel, Nuestra Senora de Atocha, etc.,* 5 Cir., 569 F.2d 330 (C.A. 5th 1978), which affirmed, with certain modifications, the judgment of this Court determining the ownership of salvaged articles from the ship *Atocha.* In order to effectuate the mandate of the Fifth Circuit, and carry out the judgment of this Court, a warrant for ar-

rest was issued to seize certain salvaged articles in the possession of the Division of Archives, History and Records Management, Department of State, State of Florida, hereinafter, Division of Archives. The Division of Archives obtained a temporary stay of the warrant from the Fifth Circuit. Subsequently, the Court of Appeals dissolved the stay and allowed execution of the warrant. Pursuant to the warrant of arrest, the property in question was seized and is now in control and possession of this Court.

The Florida Division of Archives has challenged the jurisdiction of this Court and, subject to such objection, claims it is entitled to the property in question for various reasons, principally based upon a purported contract between the Division and Treasure Salvors.

For the reasons that follow, this Court *holds*: it had jurisdiction to issue the warrant of arrest and seize the property in question; the Division of Archives is bound by the earlier judgment of this Court; Treasure Salvors, under the judgment of this Court, as affirmed by the Fifth Circuit, is the owner of the property and entitled to possession; the claims of the Division of Archives to be the owner of the property, and to be accordingly entitled to the possession of such, are wholly without merit; and the present proceedings are not barred by the Eleventh Amendment to the Constitution of the United States nor by the Doctrine of Sovereign Immunity.

Before proceeding with this memorandum's discussion of the facts and reasons in support of the Court's conclusions, prepared to satisfy the requirements of Federal Rule of Civil Procedure 52, it may be helpful to place these proceedings in proper perspective, in particular the role of the agents and employees of the State of Florida, Division of Archives.

The *Atocha* was lost at sea because of a hurricane in 1622. Spain initially located the wreck and attempted salvage, recovering two cannons. But due to various perils of the sea the wreck was shortly thereafter lost and remained lost for over three centuries.

[T]hen, in 1971, after an arduous search aided by survivors' accounts of the 1622 wrecks, and an expenditure of more than $2 million, plaintiffs located the Atocha. Plaintiffs have retrieved gold, silver, artifacts, and armament valued at $6 million. Their costs have included four lives, among them the son and daughter-in-law of Melvin Fisher, plaintiffs' president and leader of the expedition. 569 F.2d at 333.

As grave as the perils of sea are and were, the gravest perils to the treasure itself came not from the sea but from two unlikely sources. Agents of two governments, Florida and the United States, who have the highest responsibility to protect rights and property of citizens, claimed the treasure as belonging to the United States and Florida.

■ The finding of a great treasure from the days of the Spanish Main is not a cherished dream of only the United States and Florida citizens; countless people from other lands have shared such thoughts. It would amaze and surprise most citizens of this country, when their dream, at the greatest of costs, was realized, that agents of respective governments would, on the most flimsy of grounds, lay claim to the treasure. As previously determined by this Court, the wreck site is outside the territorial boundaries of the United States and Florida, and under provisions of applicable treaties, which are the supreme law of the land, no claim can be made on the basis of sovereign ownership. This Court and the Fifth Circuit rejected a sovereign prerogative argument of the United States that all treasure found by its citizens anywhere in the world belonged to the United States as the American "Crown."

The zeal of the United States in claiming the salvaged articles of the *Atocha* has been exceeded by the agents of the State of Florida. Although occasionally state employees are faulted for failure to protect state property, certainly this does not apply to the personnel of the Division of Archives who, in their unstinting efforts to claim

# 512

property belonging to Treasure Salvors, have reacted as though Treasure Salvors were attempting to steal the old Capital Building as well as the great Seal of the State.

The ship *Atocha's* association with Florida is tangential at best and certainly is not integral to the heritage and development of the State. The ship was bound on a voyage from Havana to Cadiz when the storm of 1622 drove it close to, but outside of, the boundaries of the later State of Florida. Its cargo was not connected or associated with the Florida peninsula. Nevertheless, agents from the Division of Archives have persisted in wrongfully attempting to lay claim to the salvage recovered by Treasure Salvors or an interest therein. The Division of Archives did not find the *Atocha* or its cargo, and there is no basis in fact for suggesting that the Division ever could have located it, much less recovered it. Merely because agents of the State covet the treasure, does not give the agents the right to take it in the name of the State. It is ironic that the agents of the State are able to use resources of the State to deprive Treasure Salvors of what it justly and rightfully owns, especially when the record reflects that Treasure Salvors was willing at one time to donate a portion of the salvaged articles to the State.

After presentation of evidence and argument before this Court, both the Division of Archives and Treasure Salvors filed extensive briefs. The Court agrees substantially with the reasons and arguments of Treasure Salvors.

## THE DIVISION OF ARCHIVES IS IN PRIVITY AND BOUND BY JUDGMENT OF THIS COURT AS AFFIRMED BY THE FIFTH CIRCUIT

In resolving the jurisdictional issues and the arguments advanced by the Florida Division of Archives, it is significant that the present proceeding is not a new independent action, but concerns an appropriate issuance of an ancillary warrant of arrest in a pending admiralty case over which this Court's jurisdiction is not questioned and where such ancillary warrant is necessary to carry out the judgment of this Court and the Fifth Circuit. Because of the importance of the nature of this proceeding and the relevancy of certain facts to the jurisdictional issues concerning the Eleventh Amendment and sovereign immunity, the discussion of those issues will be made at the conclusion of this memorandum.

If the Division of Archives is in privity there is no question that it would be bound by the judgment and its argument against jurisdiction would be of no avail. The Fifth Circuit ruled:

> To summarize, the district court properly adjudicated title to all those objects within its territorial jurisdiction and to those objects without its territory as between plaintiffs and the United States. In affirming the district court, we do not approve that portion of its order which may be construed as a holding that plaintiffs have exclusive title to, and the right to immediate and sole possession of, the vessel and cargo as to other claimants, if any there be, who are not parties or *privies to this litigation.* (Emphasis added) 569 F.2d at 335–336.

The crux of the Division of Archives' argument on the jurisdiction of this Court to issue the ancillary warrant of arrest is the assumption that it is not in privity nor bound by the judgment. The Division of Archives contends, in reference to the issuance of the warrant filed in this Court:

> The State of Florida was not at any time a party to this proceeding and had no interest whatsoever therein . . . The State of Florida was not a party on appeal. In affirming the District Court, this Court expressly ruled:
>
>> We do not approve that portion of its Order which may be construed as holding that plaintiffs have exclusive title to, and the right to immediate and sole possession of the vessel and cargo as to other claimants, if any there be, who are *not parties or privies* to the litigation. *Division of Archives' Reply to the Order to Show Cause,* P. 3.

By the above argument, the Division of Archives fully recognizes that, if it is bound by the judgment, its argument on lack of jurisdiction necessarily fails. The record reflects an involvement by the Division of Archives with the United States, together with a bypassing of an opportunity to intervene, which warrants a holding that the Division is and should be bound.

The Division of Archives did not intervene in the proceeding below, though it had an absolute right to do so. The Division of Archives had a contract with Treasure Salvors regarding the disposition of the treasure and a dispute arose concerning this contract. This dispute as to the terms and rights under the contract arose before Treasure Salvors and the United States went to court to settle the ownership of the treasure. The Division of Archives had notice of the initiation of the suit, and at times thereafter knew of and participated in the litigation of the suit. Being thus involved in the progress of the suit, the Division of Archives was fully aware that this suit was an *in rem* proceeding brought to settle, for all the world, the ownership rights to the treasure. Furthermore, the Division of Archives was content to sit back and rely on the federal government to represent and protect its interests, which were now in repudiation of its earlier dealings with Treasure Salvors.

The interest of the Division of Archives was intertwined and interwoven with that of the parties to the extent that Division of Archives had a right to intervene under general principles of admiralty law in reference to the *in rem* proceedings, and a right, as well, under Rule 24. The conduct of the Division of Archives is important and lends significance to its failure to intervene. Under threats of arrest, the Division of Archives coerced the acceptance of a salvage contract under which it gave nothing but a site mistakenly claimed as state submerged lands.

The Division of Archives had the right under the purported contract to divide the salvage, giving 75 percent to Treasure Salvors and retaining 25 percent at a time of its choosing. The contract had various forfeiture provisions under which the Division of Archives could claim the entire treasure. Although repeated requests were made to divide the salvage recovered, the Division of Archives refused. This refusal was in bad faith as part of a scheme by the Division to deprive Treasure Salvors of all salvaged treasure. After the Special Master in *United States v. Florida*, 420 U.S. 531, 95 S.Ct. 1162, 43 L.Ed.2d 375 (1975), determined that Florida boundaries did not in fact encompass the wreck site, and immediately after oral arguments in the Supreme Court, the Division of Archives knew its contract claim was invalid; therefore, it proceeded to immediately divide the treasure and take its purported share.

Based upon the decision of the United States Supreme Court, Treasure Salvors notified the Division of Archives that the salvage contract was a nullity. Frustrated in its desire to obtain the entire treasure under the initial contract, the Division of Archives then encouraged the United States to claim the entire treasure. The Division of Archives' plan was to work out an arrangement with the United States over division of treasure to the total exclusion of Treasure Salvors. To that end it did all it could to assist the United States in the litigation and relied upon the United States to prevail and to protect the interests of the Division of Archives.

After the United States' claim (as urged and supported by the Division of Archives in its dealings) was determined to be without merit by this Court and the Fifth Circuit, the Division of Archives attempted to paint itself as a total stranger to the litigation. It ill behooves the Division of Archives to play such a fast and loose game with courts. For all practical purposes, the Division of Archives was a party in fact, although not technically in name, to the litigation. Under all concepts of fairness, it should be treated as a party and be bound by the decree—as indeed the cases so hold.

■ There is no question, given the contract claim regarding rights to the treasure, that the Division of Archives had a right to

intervene under Rule 24(a) of the Federal Rules of Civil Procedure. The Division of Archives certainly had "an interest relating to the property or transaction which is the subject of the action" and was "so situated that the disposition of the action may as a practical matter impair or impede [the Division of Archives'] ability to protect that interest, unless the applicant's interest is adequately represented by existing parties." Rule 24(a)(2) F.R.Civ.P. In an analogous case to the instant suit, the Fifth Circuit made it clear that Rule 24(a) was to be interpreted broadly to give it full, practical effect. *Atlantis Development Corp. v. United States*, 379 F.2d 818 (C.A. 5th 1967). As the Court noted, intervention involves competing interests:

> [o]n the one hand, there is the private suitor's interests in having his own lawsuit subject to no one else's direction or meddling. On the other hand, however, is the great public interest, especially in these explosive days of ever-increasing dockets, of having a disposition at a single time of as much of the controversy to as many of the parties as is fairly possible consistent with due process. *Id.* at 824.

Considering the Division of Archives' contract, the *in rem* nature of the proceeding, and the practical reading of the rule on intervention, the Division of Archives undoubtedly could have intervened had it so desired.

It is important to understand that the Division of Archives was aware that its rights were in jeopardy and purposely chose to rely on the federal government rather than to intervene. The Division of Archives knew of the suit from its initiation and chose to cooperate with the federal government rather than assert its own rights. During the course of the litigation, the Division of Archives engaged in several activities with the federal government. The Division of Archives negotiated with the federal government to obtain an antiquities permit. Had the United States prevailed in the suit, the Division of Archives would have received an antiquities permit from the Department of the Interior for the wreck site. Furthermore, an attorney for the Florida Secretary of State (the agency which administers the Division of Archives) worked with the federal government on the case, and the Division of Archives engaged in preliminary negotiations regarding disposition of the treasure should the federal government win. The Division of Archives made the purposeful choice to cooperate with the federal government in prosecuting the case, and generally relied on the United States to protect its interest.

■ With the case decided differently than the Division of Archives desired, it now wishes to assert the interest which it should have protected by intervening in the initial suit. The policies underlying *res judicata* dictate that the Division of Archives should be bound by the previous judgment. James & Hazard, in their text on *Civil Procedure* discuss a variety of circumstances where one not officially a party to an action may nonetheless be bound by a court's decree. In order to give effect to the principles of finality embodied in the doctrine of *res judicata*, courts may invoke equitable preclusion where a nonparty has been aware of the initial litigation and failed to intervene to protect its interests. James & Hazard, *Civil Procedure* § 11.31 (1977).

A party who purposely fails to intervene is bound under the law of this Circuit. In *Aerojet-General Corp. v. Askew*, 511 F.2d 710 (C.A. 5th 1975), the plaintiff sought specific performance of a contract, asserting a right to buy various lands from a state agency. The Court held for the plaintiff. Subsequently, a Florida government unit (Dade County) came forward to halt conveyance of the land asserting that a state statute gave it absolute prior right to buy the land. The state had not utilized this argument in the original suit, *nor had the local agency intervened*, although well aware of the litigation. The Court held that the county was bound by the judgment.

In *Aerojet*, the local government contended that the district court should not have held it bound since it was not a party to the original suit. The Fifth Circuit responded:

Under the federal law of res judicata, a person may be bound by a judgment even though not a party if one of the parties to the suit is so closely aligned with his interests as to be his virtual representative. (Citations omitted).

. . . . .

The question whether a party's interests in a case are virtually representative of the interests of a nonparty is one of fact for the trial court. *See Astron Industrial Associates, Inc. v. Chrysler Motors Corp.*, 5 Cir. 1968, 405 F.2d 958, 961. We find no reason to overturn the District Court's determination that Dade County "was in such close relationship to the parties to the first lawsuit before this Court, that its interests or the interests of those which it represents, were represented in that proceeding." D.C., 366 F.Supp. at 910. *Aerojet-General Corp. v. Askew*, 511 F.2d 710, 719–20 (C.A. 5th 1975).

Because the Division of Archives cooperated with the federal government, relying on it to protect the Division of Archives' interests, it should be bound by the judgment and not permitted to ask the court to consider matters which could and should have been settled before.

The theory that a nonparty's failure to intervene should result in the decree being conclusive against that nonparty has been suggested in the United States Supreme Court. Justice Harlan in *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 114, 88 S.Ct. 733, 740, 19 L.Ed.2d 936 (1968), stated that:

It might be argued that Dutcher should be bound by the previous decision because, although technically a nonparty, he had purposely bypassed an adequate opportunity to intervene.

Furthermore, this concept of equitable preclusion has been applied in admiralty cases. In *Cummins Diesel Michigan, Inc. v. The Falcon*, 305 F.2d 721 (C.A. 7th 1962), a nonparty was held bound by a previous judgment where that nonparty had notice and an opportunity to intervene but failed to do so. *Cummins* involved an action in admiralty where plaintiff filed a libel *in rem* against a vessel, "The Falcon." Various claimants filed appearances and claimed interests and liens against the vessel. Later, one Holcomb, asserted that the court had no authority to determine the ownership of the vessel. Holcomb, however, had been given actual as well as constructive notice of the previous proceedings. Answering Holcomb's contention that the court had no authority to determine the ownership of the vessel, the court said:

This, however, did not create an issue between appellant and Holcomb, *who had an opportunity to intervene* and assert any claim to ownership. *This he failed or refused to do and, in our view, the decree is binding upon him* the same as on all other parties who were in default. *Id.* at 723 [Emphasis added].

The United States Supreme Court has held that there may be times when the opportunity to intervene may be enough to bind a person not a party. Moore, 1B *Federal Practice* ¶ 0.411 p. 94 (1977, 78 Supp.). In *Penn-Central Merger and N. & W. Inclusion Cases*, 389 U.S. 486, 88 S.Ct. 602, 19 L.Ed.2d 723 (1968), numerous plaintiffs challenged the finding of the Interstate Commerce Commission in connection with a proposed railroad merger. These actions arose in district courts in several states, and all were continued in deference to the New York Federal District Court. All plaintiffs were free to join the New York proceedings, but some chose to rely on others to represent their interests. Subsequently, these plaintiffs who had foregone their opportunity to intervene attempted to go forward with their complaints. On the issue of whether these plaintiffs should be bound, the Supreme Court said:

[They] had an adequate opportunity to join in the litigation in that court following the stay of proceedings in the Middle District of Pennsylvania. As we noted, all district courts in which actions to review the Commission's finding or for injunctive relief were filed continued their proceedings in deference to the New York court. All parties with standing to challenge the Commission's action might

have joined in the New York proceedings. In these circumstances, it necessarily follows that the decision of the New York court which, with certain exceptions, we have affirmed, precludes further judicial review or adjudication of the issues upon which it passes. *Id.* at 505–506, 88 S.Ct. at 612.

The foregoing cases clearly establish the principle that one who has an opportunity to intervene is bound by a judgment affecting his rights where he could have intervened but failed to do so to protect his interests. The facts establish the Division of Archives was fully aware of the preceding suit, consulted with the United States while they prosecuted the case and indeed negotiated with the federal government about securing a portion of the treasure. Since the Division of Archives had the opportunity but failed to intervene, instead relying on the United States to further its interests, it should now be bound by the judgment rendered previously against the United States.

In addition to being bound because of failing to intervene to protect its interests rather than relying on the United States, the Division of Archives is bound because of its participation in the previous litigation. Professor Moore discusses situations where nonparties may be bound by previous judgments. Moore, 1B *Federal Practice* ¶ 0.411[6] p. 1552 (1974):

> If a non-party who thus participates in litigation has an interest sufficiently close to the matter in litigation, and has adequate opportunity to litigate in support of or in defense against the cause of action on which the suit is based, the policies underlying the doctrine of judicial finality require that the participating non-party should be bound by the resulting judgment to the same extent as though he were a party to the action. *Id.* at 1552.

This policy of binding nonparties who have notice of and participate in the prosecution of previous litigation has been upheld by the United States Supreme Court. *Souffront v. Compagnie des Sucreries*, 217 U.S. 475, 30 S.Ct. 608, 54 L.Ed. 846 (1910). In *Souffront*, the Supreme Court said:

> The case is within the principle that one who . . . assists in the prosecution or defense of an action in aid of some interest of his own, and who does this openly, to the knowledge of the opposing party, is as much bound by the judgment . . . as he would be if he had been a party to the record. *Id.* at 487, 30 S.Ct. at 612.

The record shows that the Division of Archives knew of the suit and consulted with the federal government in the prosecution of the suit. Furthermore, the Division of Archives had an interest at stake in the previous action (an interest very similar to that of the United States) and worked with the United States, counting on the United States as a named party to represent its interest. Testimony shows that the Division of Archives had even preliminarily negotiated division of the artifacts which the United States sought to recover.

The Division of Archives was in privity with the federal government. Privity is a policy concept varying with appropriate circumstances. With regard to the principle of judicial finality Moore suggests that privity is to be found not so much in the fact that a party is acting as the representative of a nonparty, but rather that the nonparty's participation justifies holding him bound by the judgment. Moore, 1B *Federal Practice* ¶ 0.411[6] p. 1553 (1974). If a nonparty sits on the sidelines monitoring litigation, assisting in the suit, and at all times has the ability to intervene to protect its interest, it would offend the theory of judicial finality not to hold that nonparty bound by the judgment.

In order to be bound, the participating nonparty must have more than a mere academic interest in the outcome of the litigation. Moore outlines three types of interests which have been held sufficient to invoke *res judicata* effect. See Moore, 1B *Federal Practice* ¶ 0.411[6] pp. 1555, 1558, 1559 (1974). While one of these interests would be sufficient, Moore points out that

they often overlap, and a case will have characteristics of two or more of these interests. *Id.* at 1563.

The first type of interest is "[a] legal right, interest or duty dependent wholly or in part on the cause of action before the court for adjudication." *Id.* at 1555. Under this rule, a grantee who cooperates in a title suit between a third party and his grantor is bound when the grantee acquired his interest before the suit was instituted. *Souffront v. Compagnie des Sucreries, supra.* Similarly, a lessee who participated as a nonparty in defending a condemnation suit was held bound by a judgment of condemnation. *Sparks v. Gallagher,* 114 Okl. 103, 243 P. 228 (1925).

The second kind of interest which justifies binding a participating nonparty is "a proprietary right that will be affected favorably or detrimentally by the outcome of the litigation." Moore, 1B *Federal Practice* ¶ 0.411[6] p. 1558 (1974). In *Hyman v. Regenstein,* 258 F.2d 502 (C.A. 5th 1958), Hyman was an inventor and former employee of Regenstein's corporation, Velsicol. While employed at Velsicol, Hyman purportedly signed an agreement to assign all inventions and patents over to Velsicol. Subsequently, Hyman quit Velsicol and started his own corporation utilizing some of the inventions developed at Velsicol. Velsicol sued Julius Hyman & Co., and the Supreme Court of Colorado enjoined further use of the inventions finding the agreement to assign valid. *Julius Hyman & Co. v. Velsicol Corp.,* 123 Colo. 563, 233 P.2d 977 (1951); *cert. denied* 342 U.S. 870, 72 S.Ct. 113, 96 L.Ed. 654 (1951). Later Hyman sued Regenstein for damages for loss of profits on the inventions. The United States Court of Appeals for the Fifth Circuit held that the previous suit barred Hyman from contesting the validity of the agreement to assign. That issue had already been decided, and though Hyman had been sued in his corporate rather than individual capacity, he was aware of and involved in the previous litigation, and thus was bound by that judgment.

The idea of binding a participating nonparty is not novel in the Fifth Circuit. Before the *Hyman* case, *Co-op Cab Co. v. Settle,* 171 F.2d 40 (C.C.A. 5th 1948), held a nonparty bound. In *Co-op,* the city of Athens, Georgia had denied permits to operate a taxi business to Co-op's competitors. The competitors sought judicial aid in obtaining the permits. The city defended with Co-op assisting as a nonparty. The trial court held that the permits must issue, and the Georgia Supreme Court affirmed. Thereafter Co-op entered the picture as a party and attempted to enjoin the issuance of the permits. In affirming the district court's decision, the Fifth Circuit adopted the trial judge's language:

> I think the plaintiff, Co-Op Cab Company, is bound by the decree in the [previous] proceeding. It is true that it was not a formal party in the case, but it had full knowledge, and an active interest in the litigation. It furnished and paid its own counsel to defend the defendant City. The issues here could have been raised in the proceeding.

> . . . . .

> It may fairly be said that Co-Op, in substance, adopted the State Court litigation for the protection of its contract and franchise, and relied on sustaining the City's refusal to grant Settle a franchise. I think Co-Op is bound by the consequences. *Id.* at 42.

A third type of interest which has been held sufficient to bind a nonparty "exists when the nonparty has some legal right, interest or duty dependent on a question of fact or mixed fact and law that is in issue in the suit." Moore, 1B *Federal Practice* ¶ 0.411[6] p. 1559 (1974). After describing some cases which take a somewhat narrow view, Moore explains his position:

> But a different, and we are inclined to believe better, view, adopted by the Restatement of Judgments, [See Restatement of Judgments (1942) § 84] is that an interest in the determination of a question of fact or of mixed fact and law, with reference to the same subject matter or transaction, is a sufficient interest

to bring a participating nonparty within the scope of the judgment's conclusive force. And the Restatement position receives support from cases in some areas. *Id.* at 1562. For a list of cases see n. 25.

Furthermore, Moore finds that some cases will qualify for the use of *res judicata* because all three types of interests are involved. *Id.* at 1563. A common example is a patent infringement suit. Judge Brown explained the concept in the case of *Bros., Inc. v. W. E. Grace Mfg. Co.,* 261 F.2d 428 (C.A. 5th 1958). The Division of Archives comes under all three of the interests described by Moore. The Division of Archives had a proprietary right that was affected by the litigation's outcome. Also, the Division of Archives' interest depended to an extent on questions of fact or mixed law and fact questions in issue in the previous suit. Having stood on the sidelines and advised the federal government in its prosecution of the case (in fact even admitting that the General Counsel for the Secretary of State worked with the United States in presenting its case), the Division of Archives cannot now be allowed to escape the conclusive effects of that judgment.

■ In addition to having an appropriate interest in the litigation, a nonparty, to be bound, must have a requisite degree of participation in the suit. Moore, 1B *Federal Practice* ¶ 0.411[6] p. 1564 (1974).

Generally speaking, the rule as to participating non-parties requires that the nonparty have control, or at least joint control of the prosecution or defense of the suit . . . The non-party's control, however, need not be absolute: joint control by non-parties, or in conjunction with a party, is sufficient. *Id.* at 1564, 1566 [citing numerous cases].

■ Logically, the requirement of control is based on the need to insure that the nonparty truly had his day in court before involving the binding effect of the prior judgment. Where a nonparty participated in the progress of the suit, was at all times aware of the interests being adjudicated, and had the opportunity to intervene, less control should be necessary to invoke the

*res judicata* effect of the judgment. Though the Division of Archives did not control every aspect of the case, their attorney worked with the federal government; and the state and federal government cooperated in negotiations regarding the disposition of the *Atocha,* its cargo, etc. The Division purposely relied on the United States to protect its interests in the hope of obtaining a share without having to come into the litigation to assert its own claim. Being content to accept the representation of the federal government, and cooperate with the United States behind the scenes, the Division of Archives should be considered to have participated sufficiently to be bound as a nonparty. As the earlier discussion pointed out, the failure to intervene should render the Division bound regardless of the amount of the participation. The extent of the state's entanglement with and reliance on the federal government in this case simply serves to highlight the fact that equitable principles call for the Division to be bound.

## ANCILLARY PROCESS AUTHORIZED TO ARREST SALVAGED ARTICLES PERTAINING TO RES THAT HAD BEEN REMOVED FROM THE SOUTHERN DISTRICT.

■ In the alternative, even if the Division of Archives were not bound by the prior judgment, this Court had jurisdiction to issue the warrant of arrest and seize the salvaged articles in question.

After receipt of the mandate, ancillary process was issued in reference to certain articles of salvage. The warrant for arrest to obtain the property in question is authorized by Supplemental Admiralty Rule C(5). The Division of Archives has attempted to block service of the writ. The Court of Appeals for the Fifth Circuit refused to issue a Writ of Prohibition against the service of such writ. The Fifth Circuit in denying the Petition for Reconsideration and Clarification stated:

The question of the jurisdiction of the District Court for the Southern District of Florida is for that Court to determine

in the first instance on the basis of such record as may be developed in that Court.

The Division of Archives had taken the position before the Fifth Circuit that as a matter of law this Court could have no possible jurisdiction to issue the warrant for arrest in question under Admiralty Rules C(3) and the *Platoro Limited, Inc. v. Unidentified Remains of a Vessel,* 508 F.2d 1113 (5th Cir. 1975). Under the facts in this record, jurisdiction to issue warrant for arrest exists. The key fact is that this Court did acquire valid *in rem* jurisdiction and *in personam* jurisdiction in reference to the *res* situated within the Southern District and is merely seeking by ancillary process to recover a portion of salvaged articles that have been removed from the Southern District. In the instant case the warrant for arrest was ancillary in aid of the Court's unquestioned jurisdiction over the *res* previously arrested and seized within the Southern District. Further, Fed.R.Civ.P. 4(f) provides that all service of process, except subpoenas, by a Federal District Court is co-extensive with the state in which it is sitting. Under Supplemental Admiralty Rule A, the Rules of Civil Procedure apply except where "inconsistent with these supplemental rules." Division of Archives contends that the warrant for arrest cannot issue to seize property in the Northern District because Supplemental Admiralty Rule E(3) limits the service of process under Admiralty Rule C(3) to the district. There is no such limitation, however, on ancillary process under Rule C(5).

The Division of Archives' interpretation is not warranted under the rules and is not consistent with the *Platoro* decision nor with the decision of the Fifth Circuit in the present proceedings. Indeed, in *Platoro,* the Court recognized *in rem* jurisdiction could be acquired and, thus, the process could be issued, when the *res* was accidentally, fraudulently, or improperly removed from the District. 508 F.2d at 1116. The holding in *Platoro* is applicable only if no portion of the *res* had been validly arrested within the Southern District of Florida and if no other basis for the exceptions existed. The facts in *Platoro* differ markedly from

the case at bar. *Platoro* involved the problem of invoking *original in rem* jurisdiction when no portion of the *res* was present in the district when the suit was filed. In contrast, the issue before this court centers on *ancillary* jurisdiction, since original jurisdiction has been established as stated. In *Platoro,* the *plaintiffs* had removed the salvage from the district. In the present case, *the Division,* rather than Treasure Salvors, removed the articles of salvage from the Southern District. The Court finds this removal was improper and was accomplished pursuant to an invalid contract with Treasure Salvors. The Division then insisted on wrongfully detaining those portions of the *res* over which this Court had ancillary jurisdiction.

Professor Moore notes:

> Moreover, to the extent a decree *in rem* may be said to effect all the normal incidents of the arrested *res,* it may be necessary to give extra territorial effect to ancillary process to enable the court to bring within its control all property its decree will affect. It would seem that the verdict is not yet in on whether Rule E(3) prevents issuance of ancillary process beyond the geographic boundaries of the district in which a major portion of that *res* is physically located. 7A *Moore's Federal Practice* ¶ C.15 p. 700.10.

If the verdict is not in, it is now. The use of ancillary process to protect and perfect an existing *in rem* jurisdiction over articles removed to another district is proper. A contrary result would produce a multiplicity of lawsuits and conflicting judgments, for it then would be necessary even though one federal district court had *in rem* jurisdiction, to institute new and separate proceedings in every district where a portion of the *res* has been removed—hardly a desirable goal. Persuasive, if not controlling, authority for utilization of the ancillary process to obtain *in rem* jurisdiction over some articles beyond the Court's boundaries, predicated on existence of a substantial portion of the *res* within such district, is the Fifth Circuit's opinion in this case. The Fifth Cir-

cuit was well aware that although a substantial portion of the vessel's cargo was within the jurisdiction of the district court, it was not possible to physically bring all of the *res* within the district.

Initially we note that for all practical purposes it was impossible to bring the entire remains of the vessel and her cargo within the territorial jurisdiction of the court. Thousands of items retrieved from the wreck site were brought into the district, but the bulk of the wreck lies buried under tons of sand in international waters. The district court did everything within its power to have the marshal arrest the vessel and bring it within the custody of the court. Thus, there is little danger that the *res,* against which any claims might be satisfied, will escape an *in rem* decree against it. 569 F.2d at 335.

Upholding jurisdiction in the instant case will be fully in accord with the admonition given by the Fifth Circuit:

These decisions evidence the common concern of the courts with finding the most practical and efficacious means of resolving the disputes before them. An interest in rendering justice rather than an automatistic reliance upon rigid legalisms characterizes each of them. It is with these examples before us that we turn to an examination of the merits of the government's jurisdictional challenge. 569 F.2d at 334.

The validity of ancillary process outside the district is supported by the case of *The Joseph Gorham,* 13 F.Cas. 1136 (D.Conn. 1843). In *Gorham,* a ship was arrested in the Southern District of New York. Later, the ship was improperly removed to the District of Connecticut. The federal court for the Southern District of New York petitioned the federal court for the District of Connecticut to arrest the vessel and return it to New York. The federal court in Connecticut complied with the request, noting that the right to possession properly belonged to the court in New York, and the marshal for that court "[may] have followed [the ship] any where and retaken her." *Id.* at 1140. Similarly, although this court has not petitioned the Northern District to arrest the *res* in the possession of the Division, the marshal for this district, pursuant to *Gorham,* could have come to the Northern District and effected the arrest himself.

With regard to process, the case of *The Phebe,* 19 F.Cas. 426 (D.Maine 1837) is also instructive. *The Phebe* involved a challenge to the court's jurisdiction to issue process against the purchaser of a ship at a marshal's sale. The court stated that:

Process *in rem* is founded on a right in the thing, *jus in re,* and the object of the process is to obtain the thing itself . . It is not, therefore, a valid objection to the issuing the process asked for, that the person against whom it is asked is neither a party in the cause nor an officer of the court. It is a process that lies against any person who by any means, whether under color of legal process from some other tribunal or without it, has obtained the possession of that which is in the legal custody of the court. *Id.* at 427.

The Division has obtained the possession of property which is in the legal custody of this Court. The property in question is part of the entire vessel over which this Court has complete jurisdiction, regardless of whether the property was removed from the vessel prior to the vessel's arrest. *The George Prescott,* 10 F.Cas. 222 (E.D.N.Y. 1865); *The Joseph Warner,* 32 F.Supp. 532 (D.Mass.1939). Consequently, the warrant for the arrest of the property in the Northern District is a valid exercise of ancillary process in aid of existing jurisdiction, and, as such, the warrant should be executed.

The language of Rule C(5) governing ancillary process seems perfectly clear and applicable:

In any action *in rem* in which process has been served as provided in this rule, if any part of the property that is the subject of the action has not been brought within the control of the court because it has been removed . . . The court may, on motion, order . . . to show cause why it should not be delivered into the custody of the marshal . . .

The provisions of Rule C(5) were followed to the letter. This Court denied the Division of Archives' motion on the show cause.

The upholding of jurisdiction is also fully in accord with the provision of 28 U.S.C. § 1692 regarding property in different districts:

> In proceedings in a district court where a receiver is appointed for property, real, personal, or mixed, situated in different districts, process may issue and be executed in any such district as if the property lay wholly within one district, but orders affecting the property shall be entered of record in each of such districts.

In the alternative, even if the Division of Archives were not bound by the previous decree, this Court holds it acquired *in rem* jurisdiction over the articles of salvage in question through proper issuance of the ancillary warrant of arrest.

### DIVISION OF ARCHIVES' CLAIM TO PROPERTY WITHOUT MERIT

■ The portion of the *res* seized under the warrant of arrest was comprised of articles of salvage recovered from a wreck site located outside the jurisdiction of the State of Florida and on lands not owned or possessed by the State of Florida. Section 267.061(1)(b), Florida Statutes, which purports to vest title in the State does not apply since the property was not on "sovereignty lands of the State." The Division of Archives has no right nor interest in such property other than what might exist under an *ultra vires* contract between the Division and Treasure Salvors. Contrary to the Division of Archives' argument, the Supreme Court in *United States v. Florida*, 420 U.S. 531, 95 S.Ct. 1162, 43 L.Ed.2d 375 (1975), did not modify nor change the State of Florida's seaward boundary but merely defined it as it was and is. Nevertheless, the Division persists in arguing that the State's jurisdiction extends beyond the sovereign territorial waters of the United States for purposes of salvage. This Court rejects as specious a claim that the State for purposes of salvage has greater extraterritorial rights than the United States. The argu-

ment of Florida also would be in contravention to the *Convention on the Outer Continental Shelf.* April 29, 1958, 15 U.S.T. 471 (1964) T.I.A.S. No. 5578, 499 U.N.T.S. 31. The report of the International Law Commission written in conjunction with the Convention states:

> It is clearly understood that the rights in question do not cover objects such as wrecked ships and their cargos (including bullion) lying on the seabed or covered by the sand of the subsoil. 11 U.S. GAOR, Supp. 9 at 42, U.N. Doc A/3159 (1956).

The territorial rights and limits of the United States were determined by the Fifth Circuit in this case. 569 F.2d 330 *supra*. The Division of Archives has offered no creditable factual evidence to support its novel theories. This Court finds the wreck site of the *Atocha* from which the salvage articles in question were recovered was outside of Florida's jurisdiction.

■ Although the Division of Archives should have intervened earlier, at the stage where the Court acquired *in rem* jurisdiction over the present articles of salvage, the Division of Archives had the option to decide whether or not it would claim an interest in the property. The Division chose to assert on the merits, a claim to the property. Under the judgment of this Court, as affirmed by the Fifth Circuit, Treasure Salvors has a valid claim to the property seized, unless the State asserts and establishes a superior claim.

■ Since the state asserts a claim in this proceeding to the property, it necessarily waives any Eleventh Amendment objections. *Clark v. Barnard,* 108 U.S. 436, 2 S.Ct. 878, 27 L.Ed. 780 (1883); *Gunter v. Atlantic Coast Line Railroad,* 200 U.S. 273 (1906); *Gardner v. State of New Jersey,* 329 U.S. 565, 67 S.Ct. 467, 91 L.Ed. 504 (1947). See discussion of the Eleventh Amendment and Sovereign Immunity, *infra.* The Division of Archives obviously cannot ride both horses; it cannot properly assert a claim to ownership of the property and, simultaneously assert immunity under the Eleventh Amendment. These Supreme Court cases hold that when a state voluntarily

places itself in the position of a suitor, it is deemed to have laid aside its sovereignty and to have assumed the status of an ordinary suitor so far as concerns any matters properly defensive.

In *Langley v. Irons Land and Development Co.,* 94 Fla. 1010, 114 So. 769, 771–72 (1927), which remains the principal Florida case on invalidation of contract as a result of mistake, the Florida Supreme Court adopted the following statements from 4 Ruling Case Law 506:

> The jurisdiction of equity to decree the cancellation of an instrument because at the time of its execution the parties, or even one of them, labored under a mistake of fact, is well recognized; and the rule is the same whether the instrument relates to an executory agreement, or one that has been executed . . . [T]he authorities are practically unanimous in holding that the mistake must not result from the want of that degree of care and diligence which would be exercised by persons of reasonable prudence under the same circumstances, or equity will not relieve against it. Moreover, a mistake such as will entitle one to cancellation must be material to the transaction and affect the substance thereof, rather than a mere incident or the inducement for entering into it.

■ In this regard, the general maritime law, controlling here is on all fours with that of Florida. *See* Norris, *supra* § 167; *The Alert,* 56 F. 721 (S.D.N.Y.1893); *The Clotilde,* Fed.Cas. 2903 (D.Me.1872) (contract declared invalid for mutual mistake). Under maritime law, a misstatement of fact by one of the parties will result in the contract being set aside. *The Clandeboye,* 70 F. 631 (C.C.A. 4th 1895).

■ The coercive acts of the Division of Archives in threatening arrest and confiscation voids the contract under the general maritime law. *Crary v. The El Dorado,* Fed.Cas. 3362 (S.D.N.Y.1856). Contracts entered into because of compulsion, or inequality of bargaining position may be set aside. Norris, *supra* §§ 169, 170.

■ Even without the compulsion and coercion on the part of the Division of Archives, in the present case, a mutual mistake of material fact—the location of the wreck site within Florida waters—provided each party's motivation to contract. Had the parties known that, in fact, the property did not lay upon state sovereignty lands there would have been no reason to contract regarding salvage operations. In addition, prior to the litigation to determine the boundary of the State, neither party exercising reasonable diligence could have avoided the mistake of fact. The contract was therefore invalid from the time of its execution, and the fact that it has been partially performed is of no consequence.

In addition to mutual mistake of material fact, the contract between the Division of Archives and Treasure Salvors is invalid for lack or failure of consideration. *See Marks v. Fields,* 160 Fla. 789, 36 So.2d 612 (1948); *Jones v. McCallum,* 21 Fla. 392 (1885). The contract between the parties dated December 3, 1974, included in Exhibit 1, recites that the State of Florida owns the land on which the wreck is located (page 1 of contract) and further recites that the State owns the wreck and all materials found therein (page 2 of contract). In consideration of Treasure Salvors' payment of $1,200.00 and covenants to salvage the sunken property, the Division of Archives conveyed to Treasure Salvors the salvage right to the property. The Division of Archives agreed to convey, at the completion of the salvage operation, 75 percent of the material salvaged.

There was at the very least a failure of consideration on the part of the Division under the statute on which the Division relies. Section 267.061(1)(b), Florida Statutes, provides:

> It is further declared to be the public policy of the state that all treasure trove, artifacts and such objects having intrinsic or historical and archeological value *which have been abandoned on state-owned lands or state-owned sovereignty submerged lands* shall belong to the state with the title thereto vested in the divi-

sion of archives, history, and records management of the department of state for the purpose of administration and protection. [Emphasis added].

Section 267.031(5), Florida Statutes, authorizes the Division of Archives to enter into contracts which are "necessary, expedient, or incidental to the performance of its duties or the execution of its powers under this chapter."

■■■ Since the property was never actually located on Florida sovereignty submerged lands, the property did not belong to the State and, as a result, the Division lacked all authority to enter a contract conveying salvage rights. Additionally, since the property was not owned by the State, because not located on sovereignty submerged lands, the Division was without authority to promise, as consideration for the contract, 75 percent of the property recovered. An early Florida case which is still applicable adequately expresses the controlling legal maxim:

> The law aptly terms as agreement to do an act or to pay money . . . where there is no consideration for it a *nudum pactum* . . . a promise without legal support, which the law will not enforce . . . *Jones v. McCallum,* 21 Fla. 392, 395 (1885).

The contract at issue here must be deemed invalid. Aside from the coercion shown, the contract was entered into on the basis of mutual mistake of a material fact and suffers from a complete lack or failure of consideration.

■■■ Rescission of the contract is a maritime remedy and courts have discretion in its application. Before rescission may be granted, it must appear that the parties can be restored to the positions they held prior to formation of the contract. If restoration of the status quo is not possible, rescission should not be granted. *See McDonald v. Sanders,* 103 Fla. 93, 137 So. 122, 126 (1931); *Glass v. Craig,* 83 Fla. 408, 91 So. 332, 336 (1922). But the fact that a contract is partially executed will not operate as a bar to rescission of the contract if rescission is otherwise warranted. *Langley v. Irons*

*Land Development Co.,* 94 Fla. 1010, 114 So. 769, 771 (1927).

■■■ Under facts of the present case the parties can easily be restored to their prior positions by distribution of the property *in the possession of this Court* to Treasure Salvors.

The right to rescission has not been waived by Treasure Salvors. In *Rood Co. v. Board of Public Instruction,* 102 So.2d 139 (Fla.1958), the plaintiff was seeking rescission, on the basis of mistake, of a contract for sale of land and a deed executed pursuant to the contract. The court stated that the right to rescission may be waived if, after acquiring knowledge of the mistake, the party seeking rescission either "remains silent when he should speak or in any manner recognizes the contract as binding upon him, ratifies or accepts the benefits thereof . . . ." *Id.* at 141. Treasure Salvors did not remain silent after learning of the mistake, nor did it thereafter recognize the contract as binding upon either party. Instead, it notified the Division of Archives of the Supreme Court decision, suggested that the contract was null and void, removed the state agent from its vessel and, on July 19, 1975, formally declared the contract null and void.

■■■ Further, the maritime courts require of all parties to a maritime contract the utmost good faith before they can assert rights under the contract. Coercion and compulsion are evidence of bad faith. The acts of the State, contrary to the interests of Treasure Salvors, who it now claims was their agent, are egregious acts of bad faith amounting to collusion to defeat the claims of a person standing in a fiduciary relationship to the State. *See* Norris, *Law of Salvage,* Ch. VIII, Misconduct of Salvors (1958). The maritime law allows the forfeiture of all salvage claims for acts of extreme bad faith of the nature outlined above. The action of the Division, in seeking to obtain an interest from the United States, constituted a repudiation by the Division of its contract with Treasure Salvors. In occupying a mutually inconsistent posi-

tion in its dealings with the United States and with Treasure Salvors, the Division did not act in good faith towards Treasure Salvors' rights. The Division performed no salvage service of value.

■ Additionally, the contract is invalid because the states cannot constitutionally alter general admiralty and maritime jurisdiction and congressional acts thereunder. The Fifth Circuit in its decision in this case stated:

> . . . although at least one state court has invoked English common law to award ownership of a sunken vessel to the sovereign, the "American rule" vesting title in the finder has been widely recognized by courts and writers. (Citations omitted). We accept the "American rule" as it has been uniformly pronounced in the courts of this nation for over a century. *Treasure Salvors v. Unidentified Wrecked, etc.,* 569 F.2d 330, 343 (1978).

By this pronouncement, the Fifth Circuit puts into perspective the State's claim to wrecked and abandoned vessels such as the one in the case at bar.

Norris observes:

> It is the policy of the general maritime law to encourage the salvaging of derelict marine property on, and in, navigable waters. The presumption by a state of title of possession to abandoned marine property on navigable waters raises the serious constitutional question of the interference by a state of what is essentially a federal problem. Norris, *Law of Salvage,* Section 157, p. 137 (1974 Cumulative Supplement).

■ We are concerned with substantive maritime law that has been the subject of innumerable federal statutes, rules and regulations. The power of Congress to enact substantive maritime law was initially considered conferred by the Commerce Clause, e. g., *The Daniel Ball,* 10 Wall. (77 U.S.) 557, 564, 19 L.Ed. 999 (1871); *The Robert W. Parsons,* 191 U.S. 17, 24 S.Ct. 8, 48 L.Ed. 73 (1903). Later opinions firmly establish that the source of the Congress's power was the Admiralty grant itself, as supplemented by

the Necessary and Proper Clause, as Justice Bradley said in *Butler v. Boston and S. S. S. Co.,* 130 U.S. 527, 9 S.Ct. 612, 619, 32 L.Ed. 1017 (1889):

> [A]s the constitution extends the judicial power of the United States to "all cases of admiralty and maritime jurisdiction," and as this jurisdiction is held to be *exclusive,* the power of legislation on the same subject must necessarily be in the national legislature, and not in the state legislatures. (Emphasis added).

*Accord: In re Garnett,* 141 U.S. 1, 11 S.Ct. 840, 35 L.Ed. 631 (1891).

The insistence of the State that a finder of a wrecked and abandoned vessel not only does not get title but that it has the right or authority to prohibit salvage or, if granted, to regulate salvage is in direct conflict with substantive maritime law. Chapter 267, Florida Statutes, cannot be used to alter or prejudice the rights of a finder or salvager under applicable maritime law. For the State to insist that Chapter 267, Florida Statutes, governs the rights of a finder or salvager would lead to unconstitutionality of acts taken in such reliance.

■ This Court finds that Ch. 267.061 *Fla.Stat.* is not applicable to the articles of salvage in question. Because of the Division of Archives' insistence that the statute does control, the Court further finds that under the provision of that chapter, the Division still would not be entitled to prevail in this action for the several reasons previously stated. In the alternative, Ch. 267.061 *Fla.Stat.* is unconstitutional based upon the holding in *United States v. Diaz,* 499 F.2d 113 (9th Cir. 1974) noted with apparent approval of the Fifth Circuit in this case. 569 F.2d at 340. The *Diaz* case held the federal statute 16 U.S.C. § 433 concerning objects of antiquity situated on land owned and controlled by the Government of the United States to be unconstitutionally vague:

> Nowhere here do we find any definition of such terms as "ruin" or "monument" (whether historic or prehistoric) or "object of antiquity." The statute does not

limit itself to Indian reservations or to Indian relics. Hobbyists who explore the desert and its ghost towns for arrowheads and antique bottles could arguably find themselves within the Act's proscriptions. 499 F.2d at 114.

. . . . .

In our judgment the statute, by use of undefined terms of uncommon usage, is fatally vague in violation of the due process clause of the Constitution. 499 F.2d at 115.

The court relied upon *Connally v. General Const. Co.,* 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926), and *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

The Florida statute claims ownership of such items as artifacts, objects of antiquity, monuments, memorials, treasure trove, shipwrecks, etc., and is substantially identical to the Federal Act. In only one instance does the Florida Act attempt definition, and this definition is confusing. Treasure trove is defined as "gold, silver bullion, jewelry, pottery, ceramics, antique tools and fittings, ancient weapons, etc." The meaning of treasure trove at common law would not include articles of salvage.

> Treasure trove is a name given by the early common law to any gold or silver, plate or bullion, found *concealed* in the earth, or in a house or other private place, but not lying on the ground, the owner of the discovered treasure being unknown. *Livermore v. White,* 74 Me. 452, 456 (1883), *Sovern v. Yoran,* 16 Ore. 269, 20 P. 100, 8 Am.St.Rept. 293 (1888) (Emphasis added.)

> . . . [i]t is essential to the character of treasure trove that it shall have been *concealed* by the owner for safekeeping. 1 Am.Jur.2d p. 6. Perry, Sovereign Rights in Sunken Treasure, Land and Natural Resources Division Journal, U.S. Dept. of Justice, Vol. 7, No. 3, p. 89, 1969. (Emphasis added).

The extent of control over which the Division of Archives claims in reference to maritime salvage operations also raises a serious question of interference with the jurisdiction of the federal courts in admiralty and maritime matters.

 No legislation is valid if it contravenes an essential purpose expressed by Act of Congress or works material prejudice to characteristic features of general maritime law, or interferes with proper harmony and uniformity of that law in its international and interstate relations. *Southern Pacific Co. v. Jensen,* 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917), *Clyde S. S. Co. v. Walker,* 244 U.S. 255, 37 S.Ct. 545, 61 L.Ed. 1116 (1917). No state has power to abolish the well recognized maritime rule concerning measure or recovery and substitute, therefore the full indemnity rule of the common law. *See Chelentis v. Luckenbach S. S. Co.,* 247 U.S. 372, 38 S.Ct. 501, 62 L.Ed. 1171 (1918). The entire subject of maritime law including its substantive as well as its procedural features is under federal control. "The Congress thus has paramount power to determine the maritime law which shall prevail throughout the country." *Detroit Trust Co. v. Barlum S. S. Co.,* 293 U.S. 21, 43, 55 S.Ct. 31, 38, 79 L.Ed. 176 (1934).

 There can be no doubt that the attempt by the Division of Archives, under the extremely vague terms of Chapter 267, Florida Statutes, to alter general maritime law is a new and unprecedented concept. Chapter 267 and its administrative interpretation in Chapter 1A–0.01 through 1A–31, Florida Administrative Code, seeks to completely govern search, salvage and the ultimate division of recovered items. Section 1A–31.09, Florida Administrative Code, goes so far as to claim all items recovered and then leaving to the Division of Archives the complete control of any division with the finder/salvor. The application of Chapter 267, Florida Statutes to wrecked and abandoned vessels is beyond the state's power as it is maritime in nature.

By Section 9, Judiciary Act of 1789, 1 Stat. 76, 77, the District Courts of the United States were given "exclusive original cognizance of all civil cases of admiralty and maritime jurisdiction; . . . saving

to suitors, in all cases, the right of a common law remedy, where the common law is competent to give it" and this grant has been continued. 28 U.S.C. § 1333. There can be no doubt that Congress has acted to regulate salvage. The Salvage Act of 1912, 37 Stat. 242 (1912) 46 U.S.C. §§ 727–31.

The claim of the Division to the salvage articles based on the purported contract with Treasure Salvors is without merit. The claim of the Division for a salvage award is denied by the reasons previously set forth.

## NEITHER ELEVENTH AMENDMENT NOR SOVEREIGN IMMUNITY BAR PRESENT PROCEEDINGS

The Division of Archives has urged in this Court and in the Fifth Circuit, on its application for stay and prohibition, that the present proceeding is precluded by the Eleventh Amendment to the Federal Constitution. Although the amendment when applicable can certainly bar an action against the State, the amendment is not violated under the structure of the present proceedings. As noted previously, the Division of Archives had the choice to claim an interest in the *res* in this proceeding. Since the Division of Archives chose to assert such a claim on the merits, it necessarily waived the Eleventh Amendment as to *its* claim. The situation is directly analogous to a state filing a claim to a res under the jurisdiction of the Federal Bankruptcy Court. *Gardner v. State of New Jersey,* 329 U.S. 565, 573–74, 67 S.Ct. 467, 472, 91 L.Ed. 504 (1947);

> It is traditional bankruptcy law that he who invokes the aid of the bankruptcy court by offering a proof of claim and demanding its allowance must abide the consequences of that procedure. *Wiswall v. Campbell,* 93 U.S. 347, 351, 23 L.Ed. 923 (1876). If the claimant is a State, the procedure of proof and allowance is not transmitted into a suit against the State because the court entertains objections to the claim. The State is seeking something from the debtor. No judgment is sought against the State. The whole

process of proof, allowance, and distribution is, shortly speaking, an adjudication of interests claimed in a res. It is none the less such because the claim is rejected in toto, reduced in part, given a priority inferior to that claimed, or satisfied in some way other than payment in cash. When the State becomes the actor and files a claim against the fund it waives any immunity which it otherwise might have had respecting the adjudication of the claim. See *Clark v. Barnard,* 108 U.S. 436, 447, 2 S.Ct. 878, 882, 883, 27 L.Ed. 780 (1883); *Gunter v. Atlantic Coast Line R. Co.,* 200 U.S. 273, 284–289, 26 S.Ct. 252, 256–258, 50 L.Ed. 447 (1906); *Missouri v. Fiske,* 290 U.S. 18, 24, 25, 54 S.Ct. 18, 20, 78 L.Ed. 145 (1933).

The admiralty proceedings before the Court following the supplemental process can be resolved on the basis of the presentation and determination of the validity of the Division of Archives' claim. Other than determining that the Division of Archives' claim to the property is without merit, it is not necessary for this Court to adjudicate a claim by any of the parties against the State of Florida. Accordingly, any separate claims against the Division of Archives are dismissed without prejudice.

In this case, the Court on April 6, 1978, after receipt of mandate, issued the ancillary warrant of arrest to aid and carry out the judgment of this Court as affirmed by the Fifth Circuit. The Motion for the warrant correctly stated that "the State of Florida and said L. Ross Morrell and James McBeth were privy to this litigation," and asserted facts reflecting that the warrant was in reference to this Court's existing jurisdiction as affirmed by the Fifth Circuit. The State of Florida obtained an emergency stay of the warrant from a circuit judge of the Fifth Circuit on April 12, 1978. It is significant to note that the warrant was *not* issued in response to Treasure Salvors' Supplemental Complaint for Declaratory Judgment and Other Relief which was filed April 17, 1978.

In both this Court and the Fifth Circuit, the Division of Archives relies on *In re*

*State of New York,* 256 U.S. 490, 41 S.Ct. 588, 65 L.Ed. 1057 (1921), which upheld the immunity of a state to an *in personam* suit in Admiralty under the Eleventh Amendment. The present proceedings, however, are *in rem* as the result of the issuance of ancillary warrant of arrest and are governed by holdings *In re State of New York (the Queen City),* 256 U.S. 503, 41 S.Ct. 592, 65 L.Ed. 1063 (1921) and *In re Muir,* 254 U.S. 522, 41 S.Ct. 185, 65 L.Ed. 383 (1921).

The *Queen City* case was a libel *in rem,* "to recover damages alleged to have been sustained through the death of deceased by drowning due to the negligent operation of the *Queen City* . . . ." 256 U.S. at 508, 41 S.Ct. at 592. The Supreme Court after accepting as a jurisdictional fact that the *Queen City* was the "property of the state of New York" ruled that the State was exempt from the *in rem* proceeding against the vessel because it was "public property of a state used and employed for public and governmental purposes." 256 U.S. at 511, 41 S.Ct. at 593. The Court ruled that since the state's ownership of the vessel had been duly accepted in the proceedings below, the ownership now could not be contested. It is significant that the issue of ownership was treated as a jurisdictional fact for the Court to first determine as a prerequisite in determining the exemption. The Supreme Court distinguished *In re Muir* where the Court had refused to issue a Writ of Prohibition against an *in rem* proceeding because the ownership of the vessel (British Government) was not clear under the record. The Supreme Court noted:

> [I]t is apparent that the status of the Gleneden, [the ship which may have been in British service] . . . is at best doubtful and uncertain, both as matter of fact and in point of law. The jurisdiction of that court is correspondingly in doubt, for it turns on the status of the vessel. The suit is still in the interlocutory stage. The court may take up again the question of its jurisdiction. If it does, the inquiry may proceed on other lines and the facts may be brought out more fully than before. 254 U.S. at 533, 41 S.Ct. at 188.

The Fifth Circuit in this case denied the Writ of Prohibition noting that the question of jurisdiction was first to be developed in this Court. As a jurisdictional fact this Court finds the Division of Archives is not and never was the owner of the ship *Atocha,* her tackle, apparel, cargo, etc. This Court finds as fact that the Division of Archives is not and never was the rightful owner of the articles of salvage from the ship *Atocha* that were seized by the ancillary warrant of arrest and which have been improperly removed and held by the Division of Archives; that the Division of Archives is not the owner of any right or interest in such property based upon the purported and invalid contract with Treasure Salvors; and that the Division of Archives was wrongfully withholding a portion of the *res* of the *Atocha* over which this Court was properly exercising *in rem* jurisdiction.

 There is no Eleventh Amendment bar to the mere arrest of articles of salvage unless the state is the owner. If the state is not the owner, the court may proceed. It is axiomatic that the federal courts have jurisdiction to determine jurisdiction; *e. g., United States v. United Mine Workers,* 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947). This would of necessity require judicial determination of a state's immunity from jurisdiction. As reflected by the Supreme Court cases involving the Eleventh Amendment, the determination of the immunity question is a jurisdictional matter within the province of the courts; it is not *both* a self-proclaimed *and* self-determined ukase of the state.

 The present admiralty proceeding thus involves a portion of the salvaged articles pertaining to a *res* that previously was properly brought before the jurisdiction of this Court. The Division of Archives' argument in reality is predicated upon a different situation: in essence the state argues that Treasure Salvors could not institute an independent action against the Division of Archives seeking a judgment for the value of the articles wrongfully taken by the Di-

vision of Archives. Perhaps the short answer to the Division of Archives' contention is that, even if this hypothetical situation were the case, under a controlling precedent of the Florida Supreme Court, sovereign immunity would not necessarily bar such action. As Justice Terrell ruled for the Florida Supreme Court in *State Road Department of Florida v. Tharp,* 146 Fla. 745, 1 So.2d 868 (1949):

> Immunity of the State from suit does not afford relief against an unconstitutional statute or against a duty imposed on a State officer by statute, nor does it afford a State officer relief for trespassing on the rights of an individual even if he assumes to act under legal authority. It will not relieve the State against any illegal act for depriving a citizen of his property; neither will it be permitted as a plea to defeat the recovery of land or other property wrongfully taken by the State through its officers and held in the name of the State. It will not be permitted as a City of refuge for a State agency which appropriates private property before the value has been fixed and paid. 1 So.2d at 869.

■ The Eleventh Amendment is a shield to protect the fiscal integrity of the State. It is not a sword whereby agents of the State can take and appropriate the property and lives of its citizens without due process. The public policy of Florida, as held by the State's highest Court, does not tolerate misguided State employees trampling upon the basic constitutional rights of its citizens and then covering up such wrong-doings under a guise of sovereign immunity. Although the State must act through its agents, the wrongful activities of the employees of the Division of Archives are not immune. The Court finds that the agents for the Division of Archives wrongfully, and in violation of basic due process rights under Federal and Florida law, deprived Treasure Salvors of its property.

Although unnecessary to the resolution of the application of the Eleventh Amendment to the present suit, there are additional and alternative reasons that would restrict the broad and general application of the Eleventh Amendment to admiralty proceedings as urged by the Division of Archives. The Division of Archives has the power to contract and, as testified by the Deputy Secretary of State, has the power to sue and be sued. If the Deputy Secretary of State is correct, this would arguably constitute a waiver of immunity to contract actions.

■ The State Constitution authorizes the legislature to waive sovereign immunity. Fla.Const. art. 10 § 13. The legislature has waived immunity and specifically authorized suits to quiet title where the state claims an interest or lien and the plaintiff seeks to execute or foreclose a lien. Section 69.041, Florida Statutes. A suit to quiet title and to establish and foreclose a salvage lien is such a suit. Since the Division of Archives has no title to the property in suit, its claim at most, is a lien arising under the contract. The Division of Archives then claims, under the contract of salvage, that it is entitled to the articles of salvage, since the contract was partially executed. But a contract does not vest title in and of itself. Under maritime law the most that a contract for salvage vests in the parties to a salvage contract is a maritime lien.

■ Further, the legislature has authorized suits to establish claims to abandoned property. Chapters 716 and 717, Florida Statutes. Sections 716.07 and 717.22 specifically authorize suits to establish claims to abandoned property. This authorization is not limited to the state courts, but even if it were, such a limitation would be void and an intrusion by the State into an exclusive Federal domain, i. e., admiralty, where the claim is based upon the general maritime law.

The Division of Archives claims title under Section 267.061, Florida Statutes, purporting to vest title in the Department of Archives. This section is inapplicable because this Court and the Fifth Circuit already established that the property in question was found outside the territorial boundaries of the State and not on State sovereign lands. See *Treasure Salvors v.*

*Unidentified Wrecked, etc.,* 569 F.2d 330, 333 (C.A. 5th 1978). Hence, any claims the State has must of necessity fall under Chapter 716 or 717, Florida Statutes.

The State could not create a state court remedy that would apply to the pure admiralty right to award salvage service:

> The admiralty courts have exclusive jurisdiction in cases of salvage . . . based on the elements of a salvage service . . . common law courts can assess damages based upon contract, but cannot make a salvage award in the nature of a bounty for meritorious service rendered and to encourage others to do likewise. Norris, *The Law of Salvage* § 14 (1958).

Hence, the administrative claim provisions of Chapters 716 and 717 are inoperative in this purely maritime case and this Court has jurisdiction to proceed to adjudicate title to the property now in the hands of the substitute custodian though the effect will be to adjudicate the claim the Division of Archives has made to the property. This Court finds the Division of Archives has no title, the inchoate lien under the salvage contract is abrogated, and Treasure Salvors' title, as originally adjudicated, is confirmed.

In addition, this is not a suit to recover a money judgment from the State prohibited by *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) and *Ford Motor Company v. Department of Treasury,* 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945). Instead, Treasure Salvors here seeks to recover a portion of the property they own by virtue of discovery and possession on the Outer Continental Shelf. If the Division of Archives were allowed to retain this property, its officials would be acting outside the scope of their authority under state law since the state statutes under which they claim do not apply outside the State's territory. The rationale of *Home Tel. & Tel. v. Los Angeles,* 227 U.S. 278, 33 S.Ct. 312, 57 L.Ed. 510 (1913) prohibits this result since to allow such action would be to deprive Treasure Salvors of their property without due process in violation of the Fourteenth Amendment to the Constitution of the United States.

The State of Florida by engaging in a salvage operation outside of state boundaries, and outside the boundaries of the United States of America, in an exclusive area of maritime jurisdiction, submitted any claims that it might have to the jurisdiction of this admiralty court, a court of exclusive jurisdiction in *in rem* admiralty proceedings. This action constituted a further waiver of sovereign immunity within the holding of *Parden v. Terminal Railway of Alabama State Docks Department,* 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964). While *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Ford Motor Co. v. Department of Treasury,* 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945), may seem to limit *Parden,* the rationale of those cases does not apply here. First, as previously noted, this is not a suit to recover a money judgment from the state but rather an ancillary action by Treasure Salvors to bring within the jurisdiction of the court property adjudicated to be its property as against the United States and others in privity with it. Second, the limit mentioned in *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), does not apply here because there is no need for the "threshold fact of congressional authorization" to allow the plaintiff in this action to bring a suit in reference to a state's maritime activity in international waters. The Constitution of the United States, Art. 3, Sec. 2, has been interpreted to include a grant to the courts to declare the general maritime law and to supplement it—a true legislative role. Hence, there is judicial authorization of a legislative nature giving express authorization to Treasure Salvors and others similarly situated to assert a maritime claim just as explicit as the legislative grant in *Parden.*

For these reasons, and principally in reference to the discussion of *Gardner v. State of New Jersey,* 329 U.S. 565, 67 S.Ct. 467, 91 L.Ed. 504 (1947); *In re State of New York (Queen City),* 256 U.S. 503, 41 S.Ct. 592, 65 L.Ed. 1063 (1921); *In re Muir,* 254 U.S. 522, 41 S.Ct. 185, 65 L.Ed. 383 (1921); and *State*

*Road Department of Florida v. Tharp,* 146 Fla. 745, 1 So.2d 868 (1949), this Court holds that neither the Eleventh Amendment nor sovereign immunity deprive this Court of jurisdiction in its present proceedings.